**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-1215

LEGACY DATA ACCESS, INC., a Georgia corporation; DIANNE M. PETERS, a Georgia resident,

Plaintiffs - Appellees,

v.

CADRILLION, LLC, a North Carolina limited liability company; JAMES YUHAS, a North Carolina resident,

Defendants - Appellants,

and

LEGACY DATA ACCESS, LLC, a North Carolina limited liability company,

Defendant.

No. 17-1277

LEGACY DATA ACCESS, INC., a Georgia corporation; DIANNE M. PETERS, a Georgia resident,

Plaintiffs - Appellants,

v.

CADRILLION, LLC, a North Carolina limited liability company; LEGACY DATA ACCESS, LLC, a North Carolina limited liability company; JAMES YUHAS, a North Carolina resident,

Defendants - Appellees.

Appeals from the United States District Court for the Western District of North Carolina, at Charlotte. Frank D. Whitney, Chief District Judge. (3:15-cv-00163-FDW-DCK)

Argued: March 22, 2018                                          Decided: May 3, 2018

Before MOTZ, DUNCAN, and HARRIS, Circuit Judges.

Affirmed in part, reversed in part, vacated in part, and remanded by published opinion. Judge Motz wrote the opinion, in which Judge Duncan and Judge Harris joined.

**ARGUED:** Glen Kirkland Hardymon, RAYBURN COOPER & DURHAM, P.A., Charlotte, North Carolina, for Appellants/Cross-Appellees. John Robert Buric, JAMES, MCELROY & DIEHL, P.A., Charlotte, North Carolina, for Appellees/Cross-Appellants. **ON BRIEF:** Benjamin E. Shook, RAYBURN COOPER & DURHAM, P.A., Charlotte, North Carolina, for Appellants. Preston O. Odom III, John R. Brickley, JAMES, MCELROY & DIEHL P.A., Charlotte, North Carolina, for Appellees/Cross-Appellants.

DIANA GRIBBON MOTZ, Circuit Judge:

In this diversity contract dispute, a jury awarded $256,500 for breach of contract and $1,499,999 for conversion. The jury rejected plaintiffs' unfair and deceptive trade practices claim, and the district court granted judgment as a matter of law to defendants on the abuse of process claim. In a second trial solely on punitive damages, another jury awarded $3 million in punitive damages. In response to numerous post-trial motions, the district court reduced compensatory and punitive damages, awarded attorneys' fees to plaintiffs, and otherwise denied the remaining motions. For the reasons that follow, we reverse the judgment of the district court as to conversion and punitive damages, remand for a new trial on damages for breach of contract, vacate the attorneys' fees award, and affirm as to the abuse of process and unfair and deceptive trade practices claims.

I.

A.

Legacy Data Access, Inc. ("Legacy Georgia") and its owner Dianne Peters (collectively, "Plaintiffs") agreed to sell certain assets to Cadrillion, LLC ("the Agreement"). Cadrillion formed a subsidiary, Legacy Data Access, LLC ("Legacy North Carolina"), to own the assets and operate the business acquired from Legacy Georgia. Cadrillion also hired Peters to manage Legacy North Carolina for three years. The parties expected that Cadrillion, with Peters's help, would grow Legacy North Carolina's business and sell it in three to five years.

3

In exchange for Legacy Georgia's assets, Cadrillion agreed to make two separate payments: first, $513,000, which Cadrillion paid on the closing date of the Agreement, and second, a "Deferred Purchase Price," which Cadrillion was to pay upon certain specified events, such as if Cadrillion sold Legacy North Carolina. In the event that Peters resigned from her position at Legacy North Carolina after her initial three-year term, but before Cadrillion was able to sell Legacy North Carolina, Cadrillion retained "the right, but not the obligation," to "purchase . . . the rights to the Deferred Purchase Price." In other words, Cadrillion could choose to purchase Legacy Georgia's remaining interest in the value of Legacy North Carolina at that time. The Agreement called this "right" the "Call Option." To exercise this Call Option, Cadrillion had to provide "written notice to such effect" within 90 days of Peters's resignation. The Agreement included a complex formula to calculate the Deferred Purchase Price at the time Cadrillion exercised the Call Option, also known as the "Call Price."

When Peters resigned after her three-year term but before Cadrillion could sell Legacy North Carolina, Cadrillion timely provided written notice that it was exercising the Call Option. However, Cadrillion did not pay the Call Price to Legacy Georgia as the Agreement required. Instead, Cadrillion filed a declaratory judgment action in federal court, seeking a declaration that the Call Price was no more than $460,406, along with a motion to deposit that amount with the court. Plaintiffs countered that Cadrillion had incorrectly calculated the Call Price, and that depositing the funds with the court would not satisfy the Agreement. Cadrillion then decided to dismiss its action voluntarily, now taking the position that it had never exercised its Call Option in the first place.

4

B.

On April 14, 2015, Plaintiffs initiated this action against Cadrillion, Legacy North Carolina, and James Yuhas, a manager at Cadrillion. Plaintiffs asserted claims for breach of contract, conversion, abuse of process, and unfair and deceptive trade practices. The district court bifurcated the trial into a first trial on liability and compensatory damages, and a second trial on punitive damages.

After Plaintiffs' presented their evidence, the court granted judgment as a matter of law to Defendants on the abuse of process claim. The jury returned a verdict finding Cadrillion liable for breach of contract and awarding $256,500 in compensatory damages. The jury also found Cadrillion and Yuhas liable for conversion and awarded $1,499,999 in damages. The jury rejected Plaintiffs' claim of unfair and deceptive trade practices.

A separate jury later awarded Peters $3 million in punitive damages: $2 million against Cadrillion, and $1 million against Yuhas. The jury did not award punitive damages to Legacy Georgia.

Both sides filed post-trial motions. In response, the district court reduced the compensatory damages for conversion to $460,406, eliminated compensatory damages for breach of contract as a double recovery, and reduced punitive damages to $1.38 million total. The court also granted Plaintiffs' request for pre- and post-judgment interest, and awarded Plaintiffs $743,297 in attorneys' fees against Cadrillion.

Cadrillion and Yuhas timely noted this appeal, challenging their liability for conversion, the jury's award of punitive damages, and the district court's award of attorneys' fees. However, Cadrillion now concedes its liability for breach of contract.

5

*See* Appellants/Cross-Appellees Br. at 17. Plaintiffs cross-appeal, contending they are entitled to a new trial on breach of contract damages, that the district court erred in ruling against them on their abuse of process claim, and that they are entitled to judgment as a matter of law on their unfair and deceptive trade practices claim. The parties agree that North Carolina law governs this diversity case.

## II.

We first address Cadrillion and Yuhas's challenge to the conversion claim.[1]

## A.

The jury found Cadrillion liable for conversion, and the district court denied its renewed motion for judgment as a matter of law. We review *de novo* the denial of a motion for judgment as a matter of law, viewing the evidence in the light most favorable to Plaintiffs, the prevailing party in the trial court. *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 196 (4th Cir. 2017).

Cadrillion principally contends that North Carolina's economic loss rule bars Plaintiffs from asserting conversion, a tort claim,[2] for what is nothing more than a breach

---

[1] Because only Cadrillion was party to the Agreement, and because Plaintiffs' conversion claim against Yuhas is indisputably dependent on their conversion claim against Cadrillion, we refer only to "Cadrillion" in discussing the conversion claim.

[2] Under North Carolina law, the tort of conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744, 747 (N.C. 2012) (citation and internal quotation marks omitted).

of contract. North Carolina's economic loss rule provides that "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." *N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 240 S.E.2d 345, 350 (N.C. 1978).

A "tort action must be grounded on a violation of a *duty* imposed by operation of law," not a violation of a duty arising purely from "the contractual relationship of the parties." *Rountree v. Chowan Cty.*, 796 S.E.2d 827, 831 (N.C. Ct. App. 2017) (citation and internal quotation marks omitted). Thus, a "tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract." *Id.* at 830 (citation omitted). "It is the law of contract," not tort law, "which defines the obligations and remedies of the parties in such a situation." *Id.* (citation omitted). Accordingly, "North Carolina law requires" courts "to limit plaintiffs' tort claims to only those claims which are 'identifiable' and distinct from the primary breach of contract claim." *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 346 (4th Cir. 1998) (quoting *Newton v. Standard Fire Ins. Co.*, 229 S.E.2d 297, 301 (N.C. 1976)).

The economic loss rule reflects "the fundamental difference between tort and contract claims." *Id.* Contract law is designed to place an injured party in the position he would have occupied had the parties adhered to their contract. Tort law, by contrast, incorporates "principles of punishment" by allowing recovery of punitive damages. *Strum v. Exxon Co.*, 15 F.3d 327, 330 (4th Cir. 1994). In preventing parties from asserting tort claims for a simple breach of contract, the economic loss rule thus "encourages contracting parties to allocate risks for economic loss themselves." *Lord v. Customized Consulting Specialty, Inc.*, 643 S.E.2d 28, 30 (N.C. Ct. App. 2007) (opinion

7

by Wynn, J.); *see also Moore v. Coachmen Indus., Inc.*, 499 S.E.2d 772, 780 (N.C. Ct. App. 1998) ("To give a party a remedy in tort . . . would permit the party to ignore and avoid the rights and remedies granted or imposed by the parties' contract.").

We have previously rejected "attempt[s] by the plaintiff to manufacture a tort dispute out of what is, at bottom, a simple breach of contract claim" as "inconsistent both with North Carolina law and sound commercial practice." *Broussard*, 155 F.3d at 346 (quoting *Strum*, 15 F.3d at 329). In *Broussard*, the defendants contended that various contract provisions allowed them to pay advertising commissions from a particular bank account, while plaintiffs contended that the contract allowed no such thing. *See id.* We held that because the "crux of this matter is and always has been a contract dispute," the district court erred in permitting plaintiffs to assert an "extensive" array of tort claims — such as breach of fiduciary duty, fraud, and intentional interference with contractual relations — for the same alleged harm. *Id.*

The dispute here is materially indistinguishable from the one in *Broussard*. Cadrillion promised in the Agreement to pay the Call Price, then broke that promise by failing to pay. Therefore, as in *Broussard*, the "crux of this matter is and always has been a contract dispute." *See id.*

The record provides undeniable support for this conclusion. It is undisputed that Cadrillion had a duty to pay the Call Price *only* as a result of the parties' Agreement. Moreover, the Agreement itself provided for the measure of appropriate damages for this contractual breach by specifying the formula for calculating the Call Price. In other words, the Agreement fully allocated the risk of the injury that Plaintiffs suffered here.

8

The district court reached a contrary conclusion by reasoning that "Defendants did more than simply fail to perform under the contract," because they "filed an action against Plaintiffs in which they sought to deposit $460,406." But the peculiar *manner* in which Cadrillion breached the Agreement does not amount to a breach of some duty independent of Cadrillion's contractual duty. To the contrary, Plaintiffs alleged that Cadrillion converted "the Call Price" by "failing and refusing to tender" the Call Price as the Agreement required. Similarly, the special verdict form asked, "Did the Defendants convert the Call Price?" In other words, under Plaintiffs' theory, Cadrillion's breach of its contractual duty was the conversion. (At oral argument, counsel for Plaintiffs even conceded that if Cadrillion had not breached the contract, Plaintiffs would have no claim for conversion. Oral Arg. at 27:40–28:06.)

Because Cadrillion only breached a contractual duty owed to Plaintiffs, the economic loss rule applies and bars Plaintiffs' conversion claim.

B.

In arguing to the contrary, Plaintiffs principally contend that North Carolina has exempted conversion from the economic loss rule. They rely on *Ports Authority*, 240 S.E.2d at 351, which stated that the economic loss rule did not apply in two *bailment* cases involving "a conversion of the property" that was also "the subject of [a] contract": In *Simmons v. Sikes*, 24 N.C. 98, 99–100 (1841), the defendant borrowed the plaintiff's canoe, and, while acting as a bailee, allegedly smashed it to pieces; in *Williamson v. Dickens*, 27 N.C. 259, 262–66 (1844), the defendant held bonds and notes from the plaintiffs as a bailee, agreed to collect the debts due under those documents for the

9

plaintiffs, then kept some of the money for himself. Two recent cases allowing both conversion and breach of contract claims also involved bailments. *See Di Frega v. Pugliese*, 596 S.E.2d 456, 463–64 (N.C. Ct. App. 2004) (subtenant acted as bailee by accepting custody over personal property and restaurant equipment belonging to tenant); *Lake Mary Ltd. Partnership v. Johnston*, 551 S.E.2d 546, 550–52 (N.C. Ct. App. 2001) (former owner of a shopping center acted as bailee by accepting tenant rent checks intended for the new owners).

These cases provide no assistance to Plaintiffs. All they do is establish that the economic loss rule does not prohibit tort claims against a defendant who, in *addition* to and *independent* of his contractual duty, is "charged by law, as a matter of public policy, with the duty to use care in the safeguarding of the property . . . as in the case of a common carrier, an innkeeper, or *other bailee*." *Ports Authority*, 240 S.E.2d at 350–51 (emphasis added). A *bailee* has a legal duty — independent of any contractual duty — "to exercise ordinary care to protect the subject of the bailment from negligent loss, damage, or destruction." *Wilson v. Burch Farms*, 627 S.E.2d 249, 258 (N.C. Ct. App. 2006) (citation and internal quotation marks omitted). Accordingly, a conversion action can be brought against him in addition to any breach of contract claim. By contrast, where a defendant simply violates a contractual provision and undertakes *no* independent legal duty, like that of a bailee, the economic loss rule applies to bar tort claims such as conversion.

Plaintiffs' contrary argument threatens to transform numerous run-of-the-mine contract cases into tort cases with possible punitive damages. Every simple failure to pay

10

an amount due under a contract, such as a monthly mortgage payment, would potentially give rise to a conversion claim. That would undermine the economic loss rule's purposes of preventing "open-ended tort damages from distorting contractual relations," *Broussard*, 155 F.3d at 346, and "encourag[ing] contracting parties to allocate risks for economic loss themselves," *Lord*, 643 S.E.2d at 30.[3]

Here, it is undisputed that Cadrillion did not act as a bailee with custody of someone else's property, nor breach anything other than a contractual duty owed to Plaintiffs.

## C.

Plaintiffs next attempt to escape the economic loss rule by suggesting that in North Carolina, this rule only bars "negligence claims," not claims involving *intentional* torts like conversion. In support, Plaintiffs cite *Bradley Woodcraft, Inc. v. Bodden*, 795 S.E.2d 253, 258–59 (N.C. Ct. App. 2016), which held that the economic loss rule did not bar a defendant from asserting counterclaims for breach of contract *and* fraud (another intentional tort). But *Bradley Woodcraft* is simply another application of the principle that the economic loss rule does not bar tort claims based on an independent legal duty, which is "'identifiable' and distinct" from the contractual duty. *Broussard*, 155 F.3d at 346 (quoting *Newton*, 229 S.E.2d at 301). In *Bradley Woodcraft*, the defendant could

---

[3] Perhaps for this reason, Plaintiffs conceded at oral argument that failing to make mortgage payments would only constitute breach of contract, not conversion. Oral Arg. at 18:02–18:11; *see* Restatement (Second) of Torts § 242 cmt. f (Am. Law. Inst. 1965) (explaining that it is "the prevailing view that there can be no conversion of an ordinary debt").

11

counterclaim for fraud because the plaintiff not only failed to complete work required under the contract (which was a breach of contract), but "had no intention of doing so" from the very beginning (which constitutes fraud). *Bradley*, 795 S.E.2d at 256–59.

On the other hand, a plaintiff may not circumvent the economic loss rule simply by claiming that a breach of contract claim also sounds in fraud. Rather, North Carolina courts have long held that "mere unfulfilled promises cannot be made the basis of an action for fraud." *Williams v. Williams*, 18 S.E.2d 364, 366 (N.C. 1942); *accord Brandis v. Lightmotive Fatman, Inc.*, 443 S.E.2d 887, 891 (N.C. Ct. App. 1994).

What matters is not whether a plaintiff has alleged a negligence tort or an intentional tort, but whether the defendant has breached some duty other than a contractual duty, such that the tort claim is "identifiable and distinct" from the breach of contract claim.

## D.

In sum, by failing to pay the Call Price owed under the Agreement, Cadrillion breached a duty it assumed only as a result of that contract. The economic loss rule therefore applies and Cadrillion and Yuhas are entitled to judgment as a matter of law on Plaintiffs' conversion claim.[4] Moreover, because we reverse as to the conversion claim, leaving Plaintiffs with only a breach of contract claim, we must also reverse the punitive

---

[4] Because we agree with Cadrillion and Yuhas that the economic loss rule bars Plaintiffs' conversion claim in full, we do not address their additional arguments that the conversion claim fails because it concerns "unidentifiable money," that Peters is not entitled to share in the conversion award, and that Yuhas cannot be individually liable for conversion.

damages award. *See* N.C. Gen. Stat. § 1D-15(d) (1996) ("Punitive damages shall not be awarded against a person solely for breach of contract.").

## II.

We turn to Plaintiffs' principal challenge to the judgment on cross-appeal: that the district court erred in denying their motion for a new trial on damages for breach of contract. Although the jury awarded $1,499,999 in compensatory damages on Plaintiffs' conversion claim, it awarded only $256,500 for breach of contract, which Plaintiffs argue is contrary to the record evidence. We review a district court's denial of a motion for a new trial for abuse of discretion. *Gregg v. Ham*, 678 F.3d 333, 342 (4th Cir. 2012). In so doing, however, we follow North Carolina law to assess whether the jury's damages award was legally inadequate. *See Gasperini v. Ctr. of Humanities, Inc.*, 518 U.S. 415, 438 (1996).

### A.

Cadrillion first argues that Plaintiffs failed to preserve their request for a new trial on contract damages. We disagree.

"To preserve an issue for appeal, an objection [or argument] must be timely and state the grounds on which it is based." *Kollsman v. Cohen*, 996 F.2d 702, 707 (4th Cir. 1993). Here, Plaintiffs timely moved for a new trial under Rule 59, arguing, as they do on appeal, that "the $256,500 award is against the clear weight of the evidence."

Contrary to Cadrillion's assertion, Plaintiffs did not waive this issue in the course of an earlier oral discussion with the court. In that colloquy, Plaintiffs requested a new

13

trial on contract damages, and the district court informed Plaintiffs that if he sent the contract damages back for a new trial, the court would also order a new trial as to damages for conversion and *liability* for both breach of contract and conversion. As Plaintiffs did not wish to retry conversion damages or liability on either issue, they did not accept the district court's offer. But Plaintiffs never retracted their argument that the jury's award of contract damages contravened the evidence. To the contrary, Plaintiffs timely asserted precisely that argument in their written motion for a new trial, affording the district court the opportunity to fully consider the issue.

Plaintiffs thus preserved their challenge to the $256,500 contract damages award.

## B.

Turning to the merits of Plaintiffs' request for a partial new trial, North Carolina courts have required a new trial on damages where the jury's damages award was inconsistent with "clear, convincing and uncontradicted" evidence. *See Daum by Henderson v. Lorick Enters., Inc.*, 413 S.E.2d 559, 561 (N.C. Ct. App. 1992) (quoting *Robertson v. Stanley*, 206 S.E.2d 190, 193–94 (N.C. 1974)) (ordering new trial on damages where jury "arbitrarily ignored" the evidence in awarding insufficient damages for emotional distress). A party injured by a breach of contract should "be placed as near as may be in the condition which he would have occupied had the contract not been breached." *Troitino v. Goodman*, 35 S.E.2d 277, 281 (N.C. 1945); *accord Botts v. Tibbens*, 754 S.E.2d 708, 712 (N.C. Ct. App. 2014).

Since Plaintiffs claimed that Cadrillion breached the Agreement by not paying the Call Price, the appropriate measure of damages would naturally be equal to the Call

14

Price.  And as Plaintiffs point out, even *Cadrillion's* expert placed the net amount of the Call Price at somewhere between $548,227 and $953,102.  Co-Defendant Yuhas's lowest estimate of the Call Price was $460,406.  Plaintiffs' expert, meanwhile, valued the Call Price at $1,499,999.  Thus, the evidence was "clear, convincing and uncontradicted" that the Call Price was *at least* $460,406, and could not be as low as the $256,500 awarded by the jury.  *See Daum*, 413 S.E.2d at 561.[5]

Cadrillion unpersuasively seeks support from *United States v. Smoot Sand & Gravel Corp.*, 248 F.2d 822 (4th Cir. 1957).  There, we held that there is "no ground for a retrial" where "the jury's verdict is not consistent with either party's theory of valuation." *Id.* at 829.  But the jury's verdict in that case was "*within* the range of the credited testimony."  *Id.* (emphasis added).  If that were the situation here — if the damages award were somewhere between $460,406 (the lowest estimate) and $1,499,999 (the highest estimate), though not precisely equal to any of the party's estimates — Plaintiffs would have no ground for a retrial.  But the $256,500 damages award was substantially *below* "the range of the credited testimony." *See id.*  Thus, Plaintiffs are entitled to a new trial as to their damages for breach of contract.

---

[5] Cadrillion attempts to offer an explanation for the jury's $256,500 award.  As recounted above, the first of two sums that Cadrillion had to pay for the purchased assets was $513,000, which was supposed to represent the value of two-thirds of the assets. Thus, suggests Cadrillion, the jury likely extrapolated from $513,000 and awarded what would be the remaining one-third, or $256,500.  The critical problem with this notion, however, is that the parties' contract did not state that Cadrillion would pay $256,500.  It stated that Cadrillion would pay the Call Price.  And no evidence plausibly suggested the Call Price could be as low as $256,500.

Cadrillion challenges the district court's grant of $743,297 in attorneys' fees to Plaintiffs. We review a district court's grant of attorneys' fees for abuse of discretion, but review legal determinations *de novo*. *See Zoroastrian Ctr. & Darb-E-Mehr v. Rustam Guiv Found.*, 822 F.3d 739, 754 (4th Cir. 2016).

Under North Carolina law, "[i]f a business contract . . . contains a reciprocal attorneys' fees provision, the court . . . may award reasonable attorneys' fees in accordance with the terms of the business contract." N.C. Gen. Stat. § 6-21.6(c) (2015). Here, the Agreement contains such a reciprocal attorneys' fees provision, providing that "[i]n the event of any action . . . arising out of or relating to [the Agreement] or any breach . . . the party prevailing in any such action" can recover "reasonable attorneys' fees and other reasonable expenses."

A prevailing party is "one in whose favor the decision or verdict is rendered and judgment entered." *See House v. Hillhaven, Inc.*, 412 S.E.2d 893, 896 (N.C. Ct. App. 1992) (quoting 67A C.J.S. *Parties* § 6 (1979)) (internal quotation marks omitted). The jury found that Cadrillion breached its contract, and the court's judgment stated that "Cadrillion is liable to Plaintiffs for breach of contract." Cadrillion does not challenge that portion of the judgment on appeal. That means Plaintiffs are the prevailing party on the breach of contract claim.

That said, two of the factors courts may consider when determining the *amount* of "reasonable" attorneys' fees are the "the results obtained" and the "extent to which the party seeking attorneys' fees prevailed in the action." N.C. Gen. Stat. § 6-21.6(c)(1),

16

(11).  Because we reverse on the conversion claim and remand for a new trial on contract damages, the "results obtained" and "extent to which [Plainitffs] prevailed" may substantially change.  Accordingly, we vacate the district court's grant of attorneys' fees and remand for the court to reassess the proper amount of fees.

IV.

At the close of evidence, the district court orally granted Cadrillion and Yuhas's Rule 50(a) motion for judgment as a matter law on the abuse of process claim.  On cross-appeal, Plaintiffs argue this was error.[6]  We review *de novo*.  *See EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 150 (4th Cir. 2017).

Abuse of process is "the misuse of legal process for an ulterior purpose."  *Vodrey v. Golden*, 864 F.2d 28, 30 (4th Cir. 1988) (quoting *Stanback v. Stanback*, 254 S.E.2d 611, 624 (N.C. 1979)) (internal quotation marks omitted).  Under North Carolina law, it consists of two elements: an "ulterior motive" and an "act."  *See id.*  "The ulterior motive requirement is satisfied where the prior action was initiated 'to achieve a collateral purpose not within the normal scope of the process used.'"  *Id.* (quoting *Stanback*, 254 S.E.2d at 624).

Here, Plaintiffs cannot show that Cadrillion (or, by extension, Yuhas) initiated the declaratory judgment action "to achieve a collateral purpose not within the normal scope

---

[6] The district court earlier granted Co-Defendant Legacy North Carolina's similar motion for judgment as a matter of law on abuse of process, but Plaintiffs do not contest that order in this appeal.

of the process." Cadrillion sought to exercise the Call Option but pay only $460,406. For that purpose, Cadrillion filed an action seeking a declaration that the Call Price was $460,406, and moved to deposit that amount with the court. Cadrillion may well have been mistaken in believing that depositing the funds with the court would satisfy its obligations under the Agreement. But that does not change the fact that Cadrillion filed the action and the motion to deposit funds for its true purpose — to obtain a favorable declaration and deposit the funds — and not for some other, collateral purpose. *See Lyon v. May*, 424 S.E.2d 655, 659 (N.C. Ct. App. 1993) (dismissing abuse of process claim because although the "[p]laintiff was not entitled to attachment of the proceeds . . . that does not change the fact that plaintiff used the attachment for its true purpose").

Accordingly, the district court did not err in granting judgment as a matter of law in favor of Cadrillion and Yuhas on the abuse of process claim.

V.

Finally, Plaintiffs challenge the district court's denial of their Rule 50(b) motion for judgment as a matter of law on their unfair and deceptive trade practices claim. We review *de novo*, viewing the evidence in the light most favorable to Cadrillion and Yuhas, the prevailing parties in the trial court.[7] *See Bresler*, 855 F.3d at 196. "[I]f reasonable

---

[7] The jury also found in favor of Co-Defendant Legacy North Carolina on the unfair and deceptive trade practices claim, but Plaintiffs do not challenge that portion of the verdict.

minds could differ regarding the findings contained in the jury's special verdict," we "must affirm." *Id.*

To succeed on an unfair or deceptive trade practices claim, "a plaintiff must prove . . . that a defendants' unfair or deceptive action was 'in or affecting commerce'" (the "commerce element"). *White v. Thompson*, 691 S.E.2d 676, 679 (N.C. 2010) (citation omitted). The jury found that Plaintiffs had not satisfied the commerce element.

North Carolina's Unfair and Deceptive Trade Practices Act defines "commerce" as "business activities." N.C. Gen. Stat. § 75-1.1(b). And the Supreme Court of North Carolina has interpreted "business activities" to mean a business's "regular, day-to-day activities, or affairs, such as the purchase and sale of goods." *White*, 691 S.E.2d at 679 (quoting *HAJMM Co. v. House of Raeford Farms, Inc.*, 403 S.E.2d 483, 493 (N.C. 1991)).

That court has distinguished "extraordinary event[s] done for the purpose . . . of conducting [a company's] business activities," such as raising capital, as not qualifying as "business activities" and therefore not satisfying the commerce element. *HAJMM*, 403 S.E.2d at 493. Similarly, actions that "occur solely within the employer-employee relationship" have been held not to qualify as "business activities." *See White*, 691 S.E.2d at 680; *Dalton v. Camp*, 548 S.E.2d 704, 706, 711–12 (N.C. 2001). The logic animating these decisions is that the North Carolina legislature intended the statute to regulate only those business actions that affect the market at large. *See Durling v. King*, 554 S.E.2d 1, 4 (N.C. Ct. App. 2001) ("What is an unfair or deceptive trade practice usually depends upon . . . the impact the practice has in the marketplace.")

19

The jury apparently concluded that exercising the Call Option was not a "regular, day-to-day" activity for Cadrillion. *See White*, 691 S.E.2d at 679. The evidence certainly did not compel this conclusion. After all, Cadrillion is a private equity firm with business activities that might well include purchasing other companies. But Plaintiffs' allegations of unfair conduct did focus narrowly on Cadrillion's decision to exercise the Call Option and the manner in which it refused to pay the Call Price to Legacy Georgia, the company owned by Cadrillion's former employee, Dianne Peters. And it is not clear how this decision and Cadrillion's subsequent conduct impacted the marketplace at large. Moreover, the Call Option was specifically crafted to address the situation where Peters left her employment after her three-year term expired but before Cadrillion could sell Legacy North Carolina — something arguably akin to an "extraordinary event." *See id.* Given this record, although reasonable minds could differ about this issue, the evidence was sufficient for the jury to find as it did. Thus, we must affirm the jury's verdict.

Plaintiffs' contention that the district court erred by allowing the jury to decide the commerce element, rather than deciding it as a matter of law, fails because, if error, Plaintiffs invited it. Plaintiffs requested that the jury consider the commerce element and proposed a jury instruction to that effect, which the district court adopted. That forecloses Plaintiffs from now arguing that the district court erred in complying with their request. *See United States v. Hickman*, 626 F.3d 756, 772 (4th Cir. 2010).

Plaintiffs protest that they *had* to request that the jury consider the commerce element, as "failure to submit that issue to the jury [potentially] would have constituted reversible error." *See* Appellees/Cross-Appellants Reply Br. at 25. Plaintiffs thereby

20

suggest that if a litigant asks the court to take a step *required by the law*, he should be free to later argue that taking that step was erroneous. We decline to create an exception to the invited error doctrine that would allow such a strange result. If Plaintiffs wished to have the court decide the commerce element, it was incumbent upon them to make that argument and accept the consequences of doing so.

VI.

For the reasons stated above, we reverse the judgment of the district court on the conversion claim, reverse the punitive damages award, and reverse and remand for a new trial on damages for breach of contract. We also vacate the district court's grant of attorneys' fees to Plaintiffs and remand for the district court to reassess the appropriate amount of fees. Finally, we affirm the district court's judgment on the abuse of process and unfair and deceptive trade practices claims.

*AFFIRMED IN PART, REVERSED IN PART,*
*VACATED IN PART, AND REMANDED*