IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-813

Filed 6 May 2026

Forsyth County, No. 23CVS000172-330

ROBERT VAN CAMP, Plaintiff,

v.

RICHARD SHAFFNER and SHAFFNER'S AUTO BIKE CUSTOM, Defendants.

Appeal by Plaintiff from order entered 28 February 2025 by Judge Troy J. Stafford in Forsyth County Superior Court. Heard in the Court of Appeals 25 February 2026.

> *Van Camp, Meacham & Newman, PLLC, by Thomas M. Van Camp and Mary Catherine Coltrane, for Plaintiff-Appellant.*
>
> *Matthew K. Rogers for Defendants-Appellees.*

COLLINS, Judge.

Plaintiff Robert Van Camp appeals from an order granting Defendants Richard Shaffner and Shaffner's Auto Bike Custom summary judgment on Plaintiff's claims for breach of contract, negligence, negligent misrepresentation, fraud, and unfair and deceptive trade practices. Plaintiff argues that the trial court erred by granting Defendants' motion for summary judgment because there were genuine issues of material fact precluding summary judgment. For the reasons stated herein, we affirm in part and vacate and remand in part.

## I.    Background

Defendants operate a sole proprietorship in Yadkin County, North Carolina specializing in custom modifications and performance work for vehicles. Plaintiff became familiar with Defendants' work in approximately late 2014 when he brought two vehicles in for work.

Plaintiff alleges that Defendants represented having expertise in performing LS-style engine swaps. Plaintiff hired Defendants on 6 July 2015 to perform an engine swap and install a twin turbo system on his 1984 Pontiac Trans Am. Defendants texted Plaintiff that same day stating they had located an engine from a salvage yard for $1,600. Plaintiff alleges that he called Defendants to discuss the engine, and Defendants told him it was a 6.2-liter engine from a 2011 Cadillac Escalade with approximately 72,000 miles, a "perfect engine" for a turbo 600-plus horsepower build. Defendants texted Plaintiff that it was "$1,600, a good deal for that size engine. More power than some of the other variants, and a super base to build off of." Defendants deny representing to Plaintiff that the engine was a "6.2 liter out of a 2011 Cadillac Escalade with 72,000 miles" and assert that they conveyed to Plaintiff only what the salvage dealer had told them about the engine, which was that it was "a used LS 6.0 engine for a good price[.]"

Defendants generated an invoice dated 10 July 2015, listing a "SALVAGE 6.0 LS ENGINE KIT" for $1,600. Plaintiff paid for the engine that same day. The parties dispute who directed the selection of parts throughout the project. Plaintiff alleges

that Defendants selected the parts to be ordered and directed Plaintiff to purchase the parts from online shopping carts Defendants had assembled; Defendants would then text Plaintiff a general description of the charges and the total amount owed, and Plaintiff provided payment. Defendants assert that Plaintiff researched the supplier Hawks Third Gen ("Hawks") and directed Defendants to work with Hawks, and that Plaintiff purchased the parts directly at Defendants' direction based on Hawks' specifications.

Defendants worked on Plaintiff's car from 10 July 2015 through 10 February 2017, during which time they performed the engine swap and related modifications, including suspension work, drivetrain removal, fuel system layout, wiring, and various component installations. The first invoice totaled $9,261, which Plaintiff paid in full through 26 credit card payments, with the final payment of $130 made on 10 February 2017.

Defendants returned the car to Plaintiff on or about 20 February 2017. Plaintiff alleges that Defendants falsely represented that there were no problems with the car; Defendants deny making this representation. Plaintiff discovered upon picking up the car that its headlights, turn signals, brake lights, windshield wipers, radio, power windows, and interior lights were not working, and that the front end of his car was damaged. Plaintiff asserts that Defendants initially denied responsibility for the damage but later agreed to pay for repairs after Plaintiff showed them photographs of the undamaged car in their shop. Defendants concede that they

agreed to repair the damage but deny having caused it. Plaintiff returned the car to Defendants on 10 March 2017 and retrieved it approximately a week later.

The drive belt on the car's engine snapped on 26 March 2017. Plaintiff attributes this to a seized AC compressor, which caused the engine to overheat. Defendants contend that Plaintiff "created conditions that may have caused the engine to overheat" and "likely caused the drive belt to snap[.]" Plaintiff returned the car to Defendants on 28 March 2017 to replace the compressor and drive belt and to repair the speedometer and tachometer.

The parties dispute the nature and continuity of work performed between March 2017 and August 2019. Plaintiff contends that he "repeatedly took the car back to the Defendant to remedy problems" during this time. Defendants characterize this period as one during which Plaintiff possessed and drove the car without complaint.

The parties also dispute when and how installing a blower was first proposed. Plaintiff alleges that between April 2017 and January 2018, Defendants told him that the originally-planned twin turbo installation was not feasible due to spatial conflicts with the drive belt system and instead proposed installing a blower. Defendants deny that a twin turbo was part of the original scope of work and assert that Plaintiff researched and directed the blower installation. Plaintiff paid for components for the blower, including the exhaust and cam springs on 17 January 2018. However, Plaintiff texted Defendants on 27 January 2018, "Let's go ahead and get the exhaust

system done.  I may just pass on doing the blower for now[.]"  Plaintiff later texted Defendants on 31 August 2018, "Let's go ahead and do the blower in the exhaust.  I want to get it back in and get that stuff completed[.]"

The parties worked with Hawks to specify and order parts for the blower.  Most of the parts ordered from Hawks did not arrive until 26 July 2019 due to shipping errors.  In late September or early October 2019, Defendants installed the blower and notified Plaintiff that the hood would not close over the blower.  Defendants assert that they first sent Plaintiff a photograph of the issue in late September or early October 2019, and that Plaintiff asked Defendants to re-send the photograph on 30 October 2019.  Defendants removed the blower and charged Plaintiff for the installation and the removal.  Plaintiff alleges that the failed blower installation represented "either very poor planning by Defendant or a failure by Defendant to adequately research the project, or both."

After the failed blower installation, Defendants proposed installing a "sweet single Turbo" that would push 700 horsepower for $7,500, the same cost as the blower.  Plaintiff agreed because he believed no other shop would work on the car.  Plaintiff approved the turbo fabrication and paid $4,600 on 26 December 2019.  Defendants confirmed the turbo fabrication was complete on 20 January 2020 and began finalizing the build.

Defendants billed Plaintiff $14,662.97 under a second invoice dated 9 August 2019 for the blower installation and removal and the subsequent turbo installation.

Plaintiff paid $14,112.98 by six separate installment payments between 13 August 2019 through 1 April 2020, leaving a balance of $549.99.

Defendants delivered the car to SS LSX Tuning & Performance ("SS LSX") on 17 June 2020 for tuning, testing, and programming. SS LSX determined that Defendants had installed a turbo that was too small for the vehicle's engine and the incorrect type of fuel line for the in-tank pump, which was dissolving in the tank and failing to maintain pressure. Plaintiff retrieved the car from SS LSX and returned it to Defendants in July 2020 to correct the problems SS LSX had found. Plaintiff alleges that Defendants did not respond to his repeated calls, texts, and emails about the corrections Defendants would make, and that Defendants returned the car to SS LSX on 6 August 2020 without performing any of the recommended corrections. Defendants contend that they inspected the car, changed the spark plugs, adjusted the gap, and test drove the car but did not detect the issues identified by SS LSX. SS LSX emailed Defendants on 6 August 2020 asking what work had been performed, and Defendants responded, "The only issue I found is bad gas. I drained the fuel, filled up with fresh fuel, and drove, a lot."

SS LSX told Plaintiff that Defendants had made no corrections to the car, that the rear tires had been shredded, and that it would be pointless to put the car back on the tuner. Defendants assert that the tires were already old and in poor condition when they got the car, and that the power surge from the turbo caused them to spin during the test drive, indicating that the power level was correct. Plaintiff alleges

that Defendants stopped responding to his messages shortly thereafter; Plaintiff emailed Defendants on 10 August 2020 and stated that if he did not hear back by that Friday, he would "be moving forward to get the car completed with another shop and recoup [his] losses."

Plaintiff ultimately hired SS LSX to correct the issues it had found. SS LSX began working on the car in approximately March 2021. SS LSX swapped out the turbo and resolved a ruptured fuel line inside the tank before tuning the car with the new turbo. The car "made great power and held all the way to 6500 rpm." However, SS LSX noticed a distinct tapping noise in the engine.

SS LSX emailed Defendants on 20 April 2021, requesting a list of parts they had installed in the engine. Defendants responded, "It was a 100,000 plus mile motor, it has the Texas speed cam, and spring kit, new oil pump and timing components. That's really about it. Still stock bottom end, heads have never been off." SS LSX put the car back on the tuner on 26 April 2021, approximately nine months after Plaintiff's last communication with Defendants; the engine "threw a rod," which caused total engine failure. SS LSX told Plaintiff the same day that the engine installed in the car was from a 2003 Chevrolet Express van and was a 6.0-liter engine with over 100,000 miles, rather than the 6.2-liter Cadillac Escalade engine with 72,000 miles that Plaintiff alleges Defendants had originally represented. Plaintiff alleges that this was the first time he learned the engine in the car was different from what Defendants represented, nearly six years after the engine was purchased.

Plaintiff averred that he did not have access to equipment to read the engine data and was unaware it was possible to take such a reading prior to 26 April 2021.

Plaintiff filed suit in district court on 9 January 2023, asserting claims for breach of contract, negligence, negligent misrepresentation, fraud, and unfair and deceptive trade practices. Defendants answered and filed a motion to dismiss under Rule 12(b)(6) or, in the alternative, to transfer the matter to superior court. Following a hearing, the district court entered an order on 13 May 2024, dismissing any portion of Plaintiff's breach of contract claim "which occurred more than three (3) years prior to the date of filing of this action, i.e., January 9, 2020" based on the three-year statute of limitations. The district court then transferred the matter to superior court.

The parties exchanged discovery between 2023 and 2025. Defendants deny any wrongdoing and assert that they conveyed to Plaintiff only the information the salvage engine seller provided to them, which was that it was "a used LS 6.0 engine for a good price[.]" Defendants further contend that the 10 July 2015 invoice which lists a "SALVAGE 6.0 LS ENGINE KIT" accurately describes what was sold. Defendants filed a motion for summary judgment. Following a hearing, the court entered an order on 28 February 2025 granting Defendants summary judgment on all claims. Plaintiff timely appealed.

## II.    Discussion

Plaintiff argues that the trial court erred by granting Defendants summary

judgment on all claims. We address each claim in turn.

## A. Standard of Review

We review a trial court's order granting summary judgment de novo. *Patterson v. Worley*, 265 N.C. App. 626, 628 (2019). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2025).

"The party moving for summary judgment bears the burden of establishing that there is no triable issue of material fact." *Blackmon v. Tri-Arc Food Sys.*, 246 N.C. App. 38, 41 (2016). "This burden can be met by proving: (1) that an essential element of the non-moving party's claim is nonexistent; (2) that discovery indicates the non-moving party cannot produce evidence to support an essential element of his claim; or (3) that an affirmative defense would bar the claim." *CIM Ins. Corp. v. Cascade Auto Glass, Inc.*, 190 N.C. App. 808, 811 (2008) (citation omitted). If the moving party meets this burden, the non-moving party "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." N.C. Gen. Stat. § 1A-1, Rule 56(e) (2025). Affidavits, both supporting and opposing, must be made on personal knowledge, set forth facts that would be

admissible in evidence, and affirmatively show that the affiant is competent to testify to the matters stated therein. *Id.*

"In ruling on a motion for summary judgment, the trial court must view the evidence in the light most favorable to the non-moving party." *Keller v. Deerfield Episcopal Ret. Cmty., Inc.*, 271 N.C. App. 618, 622 (2020) (quotation marks and citation omitted). A trial court may not resolve factual disputes at summary judgment, *Wilson Bros. v. Mobil Oil*, 63 N.C. App. 334, 336 (1983), and findings of fact in a summary judgment order are disregarded on appeal, *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142 (1975).

## B. Breach of Contract

Plaintiff argues that the evidence "raises genuine issues of material fact concerning whether the breach of contract occurred in 2015, 2017, 2019, 2020, or 2021."

The elements of a claim for breach of contract are (1) the existence of a valid contract and (2) breach of the terms of the contract. *Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 172 N.C. App. 427, 436 (2005). The statute of limitations for a breach of contract claim is three years. N.C. Gen. Stat. § 1-52(1) (2025). "The claim accrues at the time of notice of the breach." *Henlajon, Inc. v. Branch Highways, Inc.*, 149 N.C. App. 329, 335 (2002) (citations omitted). When performance is ongoing and the parties' obligations extend over time, the limitations period for such a "continuing contract" runs from the date of final performance. *Vreede v. Koch*, 94 N.C. App. 524,

528 (1989). Whether a breach is material is ordinarily a jury question. *Charlotte Motor Speedway, Inc. v. Tindall Corp.*, 195 N.C. App. 296, 302 (2009).

Here, the record contains competing evidence regarding the existence, scope, and terms of the parties' agreement. The parties dispute whether Defendants represented that the engine was a 6.2 liter Cadillac Escalade engine with approximately 72,000 miles. The parties further dispute whether their dealings constituted a single, continuous course of dealing from 2015 to 2020 or two separate transactions, one from 2015 to 2017 for the engine installation and another from 2018 to 2019 for the blower installation. The parties also disagree on whether Defendants continued working on the car between March 2017 and August 2019 and when any alleged breach occurred.

Plaintiff presented evidence that the parties' relationship was continuous from 2015 through 2020; that Defendants continued to work on the car and received payments during that time; and that Plaintiff did not discover the alleged installation of an incorrect engine until 2021. Plaintiff also contends that there was no integrated written agreement such that the parole evidence rule does not bar his evidence of their agreement over the phone.

Defendants argue that the parties entered into two separate contracts: one in 2015 for the engine installation, and one in 2019 for the blower installation. Defendants further argue that the terms of the engine installation contract are set forth in text messages exchanged by the parties in July 2015, and that Plaintiff

should have discovered any alleged breach in either 2017 or 2018.

These discrepancies constitute genuine issues of material fact precluding summary judgment, as they determine when and how a contract was formed, the terms of that contract, whether Defendants breached the contract, and when any alleged breach occurred. Resolution of these issues depends on the weight and credibility assigned to the parties' competing evidence, which is not appropriately resolved at the summary judgment stage. *See Wilson Bros.*, 63 N.C. App. at 336.

Because these issues are material to Plaintiff's breach of contract claim, the trial court erred by granting Defendants summary judgment on this claim.

## C. Negligence

Defendant next argues that the trial court erred by granting Defendants summary judgment on his negligence claim. Plaintiff's negligence claim is barred by the economic loss rule.

To establish a claim for negligence, a plaintiff must show that: "(1) the defendant owed the plaintiff a duty of care; (2) the defendant's conduct breached that duty; (3) the breach was the actual and proximate cause of the plaintiff's injury; and (4) damages resulted from the injury." *Shelton v. Steelcase, Inc.,* 197 N.C. App. 404, 429 (2009) (quotation marks and citation omitted).

The economic loss rule "bars recovery in tort by a plaintiff against a promisor for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill." *Crescent Univ. City Venture, LLC v. Trussway Mfg., Inc.,*

376 N.C. 54, 58 (2020) (quotation marks and citation omitted). A negligence claim is barred when the alleged "injury resulting from the breach is damage to the subject matter of the contract." *Spillman v. American Homes of Mocksville, Inc.*, 108 N.C. App. 63, 65 (1992). "The plaintiff must instead look toward the breach of [the] contractual relationship with [the] supplier . . . to recover these purely economic losses." *Crescent*, 376 N.C. at 62. "[T]he economic loss rule does not bar tort claims based on an independent legal duty, which is identifiable and distinct from the contractual duty." *Legacy Data Access, Inc. v. Cadrillion, LLC*, 889 F.3d 158, 166 (4th Cir. 2018) (quotation marks and citations omitted) (applying North Carolina law).

Here, Plaintiff seeks damages as part of his negligence claim for improper installation of the engine, turbo, and fuel system; resulting engine failure; and the cost of repair and replacement. These alleged injuries constitute economic losses to the subject of the parties' agreement—the vehicle and its components. *See Spillman*, 108 N.C. App. at 65. Such losses are barred by the economic loss rule. *Crescent*, 376 N.C. at 58. As Plaintiff's negligence claim is barred by the economic loss rule, the trial court did not err by granting Defendants summary judgment on this claim.

**D. Negligent Misrepresentation**

Defendant next argues that the trial court erred by granting Defendants summary judgment on his negligent misrepresentation claim.

"[T]he tort of negligent misrepresentation occurs when (1) a party justifiably

relies, (2) to his detriment, (3) on information prepared without reasonable care, (4) by one who owed the relying party a duty of care." *Cordaro v. Harrington Bank, FSB*, 260 N.C. App. 26, 37 (2018) (quotation marks and citation omitted).

Here, Plaintiff alleges Defendants installed an engine different from the one represented, concealed defects, and misrepresented that repairs were complete. If proven, these allegations may constitute independent tortious conduct, which fall outside the economic loss rule. *See Legacy Data Access*, 889 F.3d at 166. Plaintiff presented evidence that Defendants represented the engine as a 6.2-liter Cadillac Escalade engine with 72,000 miles; that he relied on that representation; that Defendants later assured Plaintiff that issues were resolved when they were not; and that Plaintiff did not discover the true engine type until 2021. Defendants argue that the 2015 invoice listing a "SALVAGE 6.0 LS ENGINE KIT" put Plaintiff on notice of the type of engine being installed. Plaintiff, however, disputes receiving or understanding the invoice as identifying a different engine. These disputes are jury questions, as they constitute genuine issues of material fact.

Because Plaintiff forecasted evidence of negligent misrepresentation that is not barred by the economic loss rule, Defendants were likewise not entitled to judgment as a matter of law. Accordingly, the trial court erred by granting Defendants summary judgment on Plaintiff's negligent misrepresentation claim.

**E. Fraud**

"The elements of fraud are: (1) [a f]alse representation or concealment of a

material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 609 (2008) (quotation marks and citation omitted). "[W]hile claims for negligence are barred by the economic loss rule where a valid contract exists between the [parties], claims for fraud are not so barred and, indeed, the law is, in fact, to the contrary: a plaintiff may assert both claims." *Bradley Woodcraft, Inc. v. Bodden*, 251 N.C. App. 27, 34 (2016) (cleaned up).

The statute of limitations for a fraud claim is three years from "the discovery by the aggrieved party of the facts constituting the fraud[,]" N.C. Gen. Stat. § 1-52(9) (2025), or from "when the fraud reasonably should have been discovered." *Stunzi v. Medlin Motors, Inc.*, 214 N.C. App. 332, 340 (2011) (quotation marks and citation omitted). "Ordinarily, a jury must decide when fraud should have been discovered in the exercise of reasonable diligence under the circumstances. This is particularly true when the evidence is inconclusive or conflicting." *Forbis v. Neal*, 361 N.C. 519, 524 (2007) (citations omitted).

Here, Plaintiff presented evidence that Defendants affirmatively represented the engine as a 6.2-liter Cadillac Escalade engine with 72,000 miles; that Defendants knew or should have known the engine was actually a 6.0-liter Chevrolet Express van engine with over 100,000 miles; that Defendants represented that they had performed corrective work on the vehicle when they had not; and that Defendants'

statements caused Plaintiff to continue paying for parts and labor. Defendants deny these representations and argue that Plaintiff should have discovered the truth earlier. But when discovery of fraud should have occurred is ordinarily a jury question. *See id.* Because there exists genuine issues of material fact, the trial court erred by granting Defendants summary judgment on Plaintiff's fraud claim.

## F. Unfair and Deceptive Trade Practices

Defendant finally argues that the trial court erroneously granted Defendants summary judgment on his unfair and deceptive trade practices claim because his claim is "expressly based on Defendants' fraudulent misrepresentations regarding the nature, performance, and value of the engine build . . . [and t]herefore, the discovery rule applies."

Under N.C. Gen. Stat. § 75-1.1(a), "unfair or deceptive acts or practices in or affecting commerce" are unlawful. N.C. Gen. Stat. § 75-1.1(a) (2025). "To establish a prima facie claim for unfair and deceptive trade practices, the plaintiff must show: (1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Mann v. Huber Real Estate, Inc.*, 289 N.C. App. 340, 353 (2023) (cleaned up). "Whether defendants have performed the acts asserted by plaintiffs is a question of fact for a jury." *Brinkman v. Barrett Kays & Assocs., P.A.,* 155 N.C. App. 738, 743 (2003) (citation omitted). The statute of limitations for an unfair and deceptive trade practices claim is four years. *Asheville Lakeview Props., LLC v. Lake View Park*

*Comm'n, Inc.*, 254 N.C. App. 348, 355 (2017).

Here, Plaintiff's unfair and deceptive practices claim is likewise not barred by the economic loss rule because it gives rise to a separate cause of action than his breach of contract claim. *See Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 62 (1992) ("It is well recognized . . . that actions for unfair or deceptive trade practices are distinct from actions for breach of contract[.]"). Furthermore, there exists a genuine issue of material fact whether Defendants performed the acts alleged by Plaintiff. *See Brinkman,* 155 N.C. App. at 743. Plaintiff presented evidence that Defendants represented the engine as a 6.2-liter Cadillac Escalade engine with 72,000 miles but installed a 6.0-liter engine with over 100,000 miles. Plaintiff further alleges that Defendants misrepresented the repairs that were performed on the vehicle. Defendants deny these representations. These disputes are jury questions that preclude summary judgment. Accordingly, the trial court erred by granting Defendants summary judgment on Plaintiff's unfair and deceptive trade practices claim.

## III. Conclusion

The trial court did not err by granting Defendants summary judgment on Plaintiff's negligence claim, and we affirm in part. However, because the trial court erred by granting Defendants summary judgment on Plaintiff's breach of contract, negligent misrepresentation, fraud, and unfair and deceptive trade practices claims, we vacate and remand in part for further proceedings.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

Judges STADING and FREEMAN concur.