Window Gang Ventures, Corp. v. Salinas, 2019 NCBC 23.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| CARTERET COUNTY | 18 CVS 107 |

WINDOW GANG VENTURES,
CORP.,

       Plaintiff,

v.

GABRIEL SALINAS; THE GANG
GROUP, INC.; and WINDOW
NINJAS, LLC; RED WINDOW, LLC;
BLUE WINDOW, LLC; and
ORANGE WINDOW, LLC,

       Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS**

1.     **THIS MATTER** is before the Court on Defendants' Rule 12(b)(6) Motion to Dismiss (the "Motion") in the above-captioned action.  (Defs.' Rule 12(b)(6) Mot. Dismiss, ECF No. 55.)

2.     After reviewing the Motion, the briefs in support of and in opposition to the Motion, the Amended Complaint, the appropriate materials attached to and incorporated in the Amended Complaint, and the arguments of counsel at the hearing on October 25, 2018 (the "Hearing"), the Court hereby **GRANTS in part** and **DENIES in part** the Motion.

*Bell, Davis & Pitt, P.A., by Jason B. James, Joshua B. Durham, and Derek M. Bast, for Plaintiff Window Gang Ventures, Corp.*

*Hodges Coxe Potter & Phillips, LLP, by C. Wes Hodges, II, Bradley A. Coxe, and Samuel B. Potter, for Defendants Gabriel Salinas, The Gang Group, Inc., Window Ninjas, LLC, Red Window, LLC, Blue Window, LLC, and Orange Window, LLC.*

Bledsoe, Chief Judge.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

3. The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. *See, e.g.*, *Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986). Rather, the Court recites only the relevant allegations asserted in Plaintiff's Amended Complaint to determine the Motion.

4. Plaintiff Window Gang Ventures, Corp. ("Window Gang") is a North Carolina corporation with its principal place of business in Carteret County. (Am. Compl. ¶ 6, ECF No. 39.) Window Gang is "engaged in the business of operating or franchising 'Window Gang' locations for residential, commercial, industrial and high-rise cleaning services including window cleaning, blind cleaning, gutter cleaning, window tinting, chimney sweeping, dryer vent cleaning, roof washing, oil remediation, no slips floor, and low and high pressure spray applications." (Am. Compl. ¶ 16.) Window Gang has locations in twenty states, and each location is operated by a Window Gang-owned business or a franchise specifically authorized by Window Gang to conduct business in a designated territory. (Am. Compl. ¶ 17.)

5. Defendant Gabriel Salinas ("Salinas") is a citizen and resident of New Hanover County and is the President and Registered Agent for Defendant The Gang Group, Inc. ("Gang Group"). (Am. Compl. ¶¶ 7–8.) Gang Group is a North Carolina corporation, and Defendant Window Ninjas, LLC ("Window Ninjas") is a North Carolina limited liability company. (Am. Compl. ¶¶ 8–9.) Both Gang Group and

Window Ninjas maintain their principal places of business in New Hanover County, North Carolina. (Am. Compl. ¶¶ 8—9.)

6. Defendants Red Window, LLC ("Red Window"), Orange Window, LLC ("Orange Window"), and Blue Window, LLC ("Blue Window") (together, the "Affiliated Defendants") are limited liability companies organized by Salinas to operate Window Gang franchises in South Carolina, Tennessee, and Virginia, respectively. (Am. Compl. ¶¶ 10–13.)

7. On or about July 22, 1997, Salinas entered into a franchise agreement with Window Gang which granted him the exclusive right to operate a Window Gang franchise in "Wilmington, NC, (New Hanover County); Brunswick County; Pender County; and Duplin County" for ten years (the "1997 Franchise Agreement"). (Am. Compl. ¶ 28.) The 1997 Franchise Agreement also granted Salinas a limited right to use Window Gang's trade secrets. (Am. Compl. ¶ 27.) On or about June 10, 2007, Salinas, "individually and on behalf of Gang Group," entered into a renewal franchise agreement (the "2007 Franchise Agreement"), extending the franchise relationship through 2017.[1] (Am. Compl. ¶ 31.) The 2007 Franchise Agreement specifically defined Salinas and Gang Group's operating territory as the "Wilmington, NC, area." (2007 Franchise Agreement.)

8. Window Gang alleges that "[f]rom 1997 through December 15, 2017, Salinas and Gang Group operated the Wilmington Territory (New Hanover, Brunswick,

---

[1] The 2007 Franchise Agreement attached to the Amended Complaint is signed by Salinas as franchisee and identifies Window Gang and Salinas as the only contracting parties. (Am. Compl. Ex. 2, at Ex. A [hereinafter the "2007 Franchise Agreement"], ECF No. 39.2.)

Duplin, and Pender Counties) Window Gang franchise," (Am. Compl. ¶ 39), and occasionally serviced customers outside the Wilmington Territory, (Am. Compl. ¶ 41). During the latter portion of this period, the Affiliated Defendants operated Window Gang franchises in other states under oral agreements with Window Gang containing the same terms set forth in Salinas's franchise agreements. (Am. Compl. ¶¶ 42–43.)

9. In early 2017, Window Gang provided Defendants with new franchise agreements and began negotiating a ten-year extension of the franchise relationship from 2017 to 2027. (Am. Compl. ¶ 45.) Soon thereafter, Salinas confirmed to Window Gang that the agreements were under review and that "his signature was forthcoming." (Am. Compl. ¶ 46.) Although the 2007 Franchise Agreement expired on June 10, 2017, Salinas, Gang Group, and the Affiliated Defendants continued to pay monthly royalty fees to Window Gang under an "oral license" until September 2017. (Am. Compl. ¶ 49.) Salinas and Gang Group continued to operate in the Wilmington Territory as a Window Gang franchise until December 15, 2017. (Am. Compl. ¶ 39.)

10. Window Gang alleges that during these 2017 negotiations, Salinas "began operating a competing window cleaning, blind cleaning, gutter cleaning and high pressure spray application service business, [called] Window Ninjas, in the Wilmington territory and in other" territories in which he had previously conducted business as a Window Gang franchisee. (Am. Compl. ¶ 50.) Window Gang contends that in launching and operating Window Ninjas, "Salinas utilized the proprietary Window Gang system, customer lists, phone numbers, and [Window Gang's trade

secrets]" to compete with Window Gang in violation of the 2007 Franchise Agreement. (Am. Compl. ¶ 51.)

11. Window Gang further asserts that Salinas intentionally diverted customers and revenue from Window Gang to Window Ninjas using e-mail, social media, and direct marketing. (Am. Compl. ¶ 52; Am. Compl. Ex. 4, ECF No. 39.4.) Window Gang alleges that Defendants utilized Window Gang's customer lists and other trade secrets to falsely represent to existing and potential customers that Window Gang had gone out of business, was no longer servicing the customers' areas, or had changed its name to Window Ninjas. (Am. Compl. ¶ 53; *see* Am. Compl. Ex. 4; Am. Compl. Ex. 5, ECF No 39.5.) Defendants also continued to use and advertise telephone numbers licensed and used by Window Gang in their efforts to advance Window Ninjas' business. (Am. Compl. ¶ 63.)

12. Window Gang filed its Complaint initiating this action on February 1, 2018, asserting claims for: (i) breach of the covenant not to compete in the 2007 Franchise Agreement;[2] (ii) conversion; (iii) tortious interference with contract and tortious interference with prospective economic advantage; (iv) trade secret misappropriation; (v) trademark infringement; (vi) and violation of the Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* ("UDTPA"). Contemporaneously with the filing of the Complaint, Window Gang sought and obtained a temporary

---

[2] Although Defendants have also sought the dismissal of any Window Gang claim based on an alleged breach of the non-solicitation provision in the 2007 Franchise Agreement, Window Gang has not attempted to enforce that provision and has confirmed that "the Amended Complaint does not contend that the Franchise Agreement with Salinas contains an enforceable covenant against solicitation." (Pl.'s Resp. Br. Opp. Defs.' Mot. Dismiss 19 [hereinafter "Pl.'s Resp. Br."], ECF No. 58.)

restraining order (the "TRO") from Superior Court Judge John E. Nobles, Jr. The TRO restricted Defendants from using Window Gang's "[m]arks, likeness, good will, customer lists, Trade Secrets and proprietary systems and processes as defined in the Complaint and from soliciting or interfering with Window Gang, its customers, or contracts." (Order Granting TRO 1, ECF No. 4.) The TRO further ordered Defendants to immediately stop using certain phone numbers belonging to Window Gang. (Order Granting TRO 2.)

13. The next day, on February 2, 2018, Defendants filed a Notice of Designation seeking to designate this matter as a mandatory complex business case under N.C. Gen. Stat. § 7A-45.4. (Notice Designation, ECF No. 5.) The case was subsequently designated as a mandatory complex business case, (Designation Order, ECF No. 6), and, on February 6, 2018, assigned to the undersigned, (Assignment Order, ECF No. 2).

14. On February 13, 2018, Window Gang filed a motion for preliminary injunction, (Pl.'s Mot. Prelim. Inj., ECF No. 14), reiterating its arguments in support of its TRO Motion and further contending that while Salinas was operating as a Window Gang franchisee, he used an e-mail account (the "Google Account") to store materials belonging to Window Gang, including customer information. (Pl.'s Mem. Law Supp. Mot. Prel. Inj. 11, ECF No. 16.)

15. After expedited briefing, the Court held a hearing on Window Gang's preliminary injunction motion on February 16, 2018. The Court subsequently issued a Preliminary Injunction on February 21, 2018, requiring Defendants to return all

Window Gang Protected Information,[3] and prohibiting Defendants from using and accessing the Google Account.  *Id.* at *33–36.

16.    Window Gang alleges that on February 19, 2018—three days after the preliminary injunction hearing but before the Court's ruling—Brandee Pohlson ("Pohlson"), Gang Group's Office Manager and Window Ninjas' Vice President of Operations, accessed the Google Account, (Am. Compl. ¶ 90; Am. Compl. Ex. 13, at 6, ECF No. 39.13), and "moved well over a thousand files [related to the operation of Window Gang franchises] into the trash[,]" (Am. Compl. ¶ 91; Am. Compl. Ex. 14, ECF No. 39.14).  According to Window Gang, Pohlson now admits that she deleted files from the Google Account on February 19 and 27, 2018, and that she was specifically "deleting all files off the [Google Account] that contained the name or mark for Window Gang."  (Am. Compl. ¶ 96; *see* Am. Compl. Ex. 16, at ¶ 8, ECF No 39.16 (emphasis omitted).)  Window Gang also contends that Defendants continued to use Window Gang's phone numbers after entry of the Preliminary Injunction.  (Am. Compl. ¶¶ 65–67.)

17.    In light of Defendants' conduct, Window Gang filed an Amended Complaint on April 20, 2018, which abandoned its claim for unjust enrichment and asserted new

---

[3] The Preliminary Injunction defines "Protected Information" as "all signs, catalogues, advertising materials, forms, invoices and other materials containing the WINDOW GANG Names and Marks or otherwise relating to the Franchise," Window Gang's proprietary and confidential information, "including without limitation the contents of the Operations Manual and specifications, standards and operation procedures of the WINDOW GANG Franchise," as well as "training materials, operation procedures, client lists and other data." *Window Gang Ventures, Corp. v. Salinas*, 2018 NCBC LEXIS 18, at *18–19 (N.C. Super. Ct. Feb. 21, 2018).

claims for trademark infringement under N.C. Gen. Stat. §§ 80-11 and 80-13, civil obstruction of justice, and civil conspiracy to commit civil obstruction of justice.

18. Defendants filed the Motion on August 10, 2018, seeking dismissal of all of Window Gang's claims against all Defendants. The Motion has been fully briefed, the Hearing has been held, and the Motion is now ripe for resolution.

II.

LEGAL STANDARD

19. In ruling on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court's inquiry is "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Corwin v. British Am. Tobacco PLC*, 821 S.E.2d 729, 736 (N.C. 2018) (quoting *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51, 790 S.E.2d 657, 659 (2016)).

20. "When documents are attached to or incorporated into a complaint," the Court may consider those documents without converting the motion into one for summary judgment under Rule 56. *Schlieper v. Johnson*, 195 N.C. App. 257, 261, 672 S.E.2d 548, 551 (2009).

21. "It is well established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the . . . claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the . . . claim.'" *Corwin*, 821 S.E.2d at 736–37 (quoting *Wood v. Guilford County*, 355 N.C. 161, 166, 558,

S.E.2d 490, 494 (2002)). The Court will not grant a motion to dismiss "unless it appears to a certainty that [the] plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted).

22. The Court construes the allegations in the pleading "in the light most favorable to the non-moving party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017). The Court is not required, however, "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005); *see also McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013) (treating plaintiffs' factual allegations as true, but ignoring their legal conclusions). The Court may also "reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009).

III.

ANALYSIS

A. <u>Breach of Contract: Breach of the Non-compete Provision</u>

23. Window Gang alleges that Salinas, Gang Group, and the Affiliated Defendants breached the 2007 Franchise Agreement by

> engag[ing] in direct competition with Window Gang, disparag[ing] Window Gang, divert[ing] customers away from Window Gang to . . . Window Ninjas, transferr[ing] Window Gang telephone numbers into the name of Window Ninjas, fail[ing] to keep Window Gang's [trade secrets], fail[ing] to return

information and documents belonging to Window [Gang], and failing to pay [required] royalty payments in addition to other breaches of the written and oral agreements.

(Am. Compl. ¶ 118.)

24. Defendants seek dismissal of Window Gang's breach of contract claim only as it relates to the non-competition provision, contending that the provision is unenforceable as a matter of law because it is overbroad as to territory and fails to protect Window Gang's legitimate business interests. (Mem. Law Supp. Defs.' Mot. Dismiss 4–13 [hereinafter "Defs.' Mot. Dismiss Br."], ECF No. 38.)

25. Covenants not to compete are "disfavored" under North Carolina law. *Howard v. Oakwood Homes, Corp.*, 134 N.C. App. 116, 121–22, 516 S.E.2d 879, 883 (1999). Nevertheless, a covenant not to compete is enforceable if it is (i) in writing, (ii) made as part of the employment contract, (iii) supported by valuable consideration, (iv) reasonable as to time and territory, and (v) designed to protect the employer's legitimate business interest. *See Hartman v. W.H. Odell & Assocs., Inc.*, 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994). Window Gang, as the party seeking to enforce the covenant, has the burden to prove the covenant's restrictions are reasonable. *Id.* The reasonableness of a non-competition agreement is a matter of law for the court. *Med. Staffing Network, Inc. v. Ridgeway*, 194 N.C. App. 649, 655, 670 S.E.2d 321, 327 (2009) (citing *Shute v. Health*, 131 N.C. 281, 282, 42 S.E. 704, 704 (1902)).

26. As an initial matter, the only written non-competition provision at issue is in the 2007 Franchise Agreement, a document Window Gang alleges Salinas signed

both in his individual capacity and on behalf of Gang Group. (*See* Am. Compl. ¶ 31; 2007 Franchise Agreement § 16.5.) Window Gang appropriately "concedes that it is only pursuing its non-competition claim against Salinas, and those acting in concert with him, arising from [the 2007 Franchise Agreement]." (Pl.'s Resp. Br. 5.) As a result, Window Gang's breach of contract claim against the Affiliated Defendants shall be dismissed because it is based on the breach of an alleged non-competition agreement that Window Gang has failed to plead was ever reduced to writing.

27. Turning then to Window Gang's breach of contract claim against Salinas and Gang Group, the non-competition provision in the 2007 Franchise Agreement (the "Non-compete") provides that, for a period of two years after the termination or expiration of that agreement, Salinas and Gang Group will not:

> have any interest as an owner (except of publicly traded securities that are traded on a stock exchange or on the over-the-counter market), partner, director, officer, employee, consultant, representative or agent, or in any other capacity, in any other business conducting residential or commercial cleaning services including window cleaning, blind cleaning, gutter cleaning and high pressure spray applications or any business which is the same, similar to or competitive with [Window Gang] and the WINDOW GANG Franchise System within a radius of 50 miles of [their] Operating Territory.

(2007 Franchise Agreement § 16.5.) As previously discussed, the 2007 Franchise Agreement designates Salinas and Gang Group's Operating Territory as the "Wilmington, NC, area[,]" (2007 Franchise Agreement, at Ex. A), and Window Gang alleges that Salinas, Gang Group, and Window Gang all understood through their course of dealing that the "Wilmington, NC, area" encompassed New Hanover, Brunswick, Pender, and Duplin Counties, (Am. Compl. ¶ 39; Pl.'s Resp. Br. 10).

28.     When evaluating the enforceability of covenants not to compete, North Carolina courts note a distinction between covenants relating to the sale of business and those ancillary to employment contracts. *See Outdoor Lighting Perspectives Franchising, Inc. v. Harders*, 2012 NCBC LEXIS 28, at *19 (N.C. Super. Ct. May 14, 2012), *aff'd*, 228 N.C. App. 613, 747 S.E.2d 256 (2013). Our appellate courts have determined that non-competes in franchise agreements present hybrid situations in which courts should combine the elements used to evaluate non-competes for the sale of a business and those used to analyze non-competes in employment contracts. *See Outdoor Lighting Perspectives Franchising, Inc. v. Harders*, 228 N.C. App. 613, 621–23, 747 S.E.2d 256, 262–64 (2013). As stated by the Court of Appeals:

> the ultimate issue which we must decide in resolving such disputes among franchisors and franchisees is the extent to which the non-competition provision contained in the franchise agreement is no more restrictive than is necessary to protect the legitimate interests of the franchisor, with the relevant factors to be considered in the making of this determination to include the reasonableness of the duration of the restriction, the reasonableness of the geographic scope of the restriction, and the extent to which the restriction is otherwise necessary to protect the legitimate interests of the franchisor.

*Id.* at 623, 747 S.E.2d at 264.

29.     "In evaluating reasonableness, the time and territory restrictions must be read in tandem[.]" *Hartman*, 117 N.C. App. at 311, 450 S.E.2d at 916. While "either the time or the territory restriction, standing alone, may be reasonable, the combined effect of the two may be unreasonable." *Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 280, 530 S.E.2d 878, 881 (2000).

30. Courts applying North Carolina law have regularly held that a two-year post-employment or post-sale non-competition restriction similar to that here is reasonable. *See, e.g., Kinston Med. Specialists, P.A. v. Bundle*, 2015 NCBC LEXIS 48, at *7 (N.C. Super. Ct. May 7, 2015); *see also Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 717 (M.D.N.C. 2009) (observing that a two-year time restriction was "well within the range that the North Carolina courts have deemed reasonable").

31. In determining the reasonableness of the geographic scope of a non-compete agreement in the employment context, courts assess, among other things:

> (1) the area, or scope, of the restriction, (2) the area assigned to [the] employee, (3) the area in which the employee actually worked or was subject to work, (4) the area in which the employer operated, (5) the nature of the business involved, and (6) the nature of the employee's duty and his knowledge of the employer's business operation.

*Outdoor Lighting*, 228 N.C. App. at 622, 747 S.E.2d at 263 (quoting *Clyde Rudd & Assocs., Inc. v. Taylor*, 29 N.C. App. 679, 684, 225 S.E.2d 602, 605 (1976)). "Ordinarily, a covenant's geographic scope will be found reasonable if it encompasses the area served by the business that the covenant protects." *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 698, 784 S.E.2d 457, 461 (2016) (citing *Thompson v. Turner*, 245 N.C. 478, 481–82, 96 S.E.2d 263, 266 (1957)).

32. To support their contention that the Non-compete at issue here is unenforceable as to time and territory, Defendants rely heavily on the Court of Appeals' statement in *Farr*, that "[t]o prove that a geographic restriction in a non-compete provision is reasonable, an employer must first show where its customers

are located and that the geographic scope of the covenant is necessary to maintain those customer relationships." *Farr Assocs.*, 138 N.C. App. at 281, 530 S.E.2d at 882. Defendants contend that Window Gang's claim necessarily fails under *Farr* because Window Gang has failed to allege that it has existing customers located within New Hanover, Brunswick, Pender, and Duplin Counties, or that Window Gang has any customers within a 50-mile radius beyond the borders of those counties. (Defs.' Mot. Dismiss Br. 7–9); *see also Okuma Am. Corp. v. Bowers*, 181 N.C. App. 85, 89, 638 S.E.2d 617, 620 (2007) ("[T]he scope of [a] geographic restriction must not be any wider than is necessary to protect the employer's reasonable business interests."). The Court disagrees on the alleged facts.

33. Although in bare-bones fashion, Window Gang has alleged that it serviced customers in New Hanover, Pender, and Brunswick Counties within the "Wilmington, NC, area," as well as customers in Bladen and Onslow Counties within a 50-mile radius of the "Wilmington, NC, area." (Am. Compl. ¶¶ 39–41.) Thus, the Court cannot conclude, at the Rule 12(b)(6) stage, that the Non-compete's geographic scope, when considered with its two-year duration, renders the provision unenforceable as a matter of law. *See, e.g., Sandhills Home Care, LLC v. Companion Home Care - Unimed, Inc.*, 2016 NCBC LEXIS 61, at *19–20 (N.C. Super. Ct. Aug. 1, 2016) (finding general allegation that plaintiff provided services in a restricted territory within 100-mile radius of plaintiff's location sufficient to survive Rule 12(b)(6) dismissal); *Kinston*, 2015 NCBC LEXIS 48, at *8–9 (finding general allegation that a regional medical center had locations in Lenoir and Onslow Counties

"minimally sufficient to survive dismissal" under Rule 12(b)(6) where the restricted territory included those counties and four others). The Court's conclusion on this aspect of Defendant's argument, however, does not end the inquiry.

34. In addition to the reasonableness of the time and territory restrictions, the Court must also consider "the extent to which the restriction is otherwise necessary to protect the legitimate interests of the franchisor." *Outdoor Lighting*, 228 N.C. App. at 623, 747 S.E.2d at 264. It is at this level of the analysis that Window Gang's claim for breach of the Non-compete fails as a matter of law.

35. In the employment context, our courts have recognized that an employer has a legitimate interest in protecting "customer relationships and goodwill against misappropriation by departing employees." *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 651, 370 S.E.2d 375, 381 (1988). Nevertheless, the restriction "must be no wider in scope than is necessary to protect the business of the employer." *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508, 606 S.E.2d 359, 362 (2004). Our courts routinely hold that non-competition covenants are overbroad, and therefore unenforceable, when they "prohibit the employee from engaging in future work that is distinct from the duties actually performed by the employee." *Ridgeway*, 194 N.C. App. at 656, 670 S.E.2d at 327; *see, e.g.*, *Hartman*, 117 N.C. App. at 317, 450 S.E.2d at 920 (invalidating non-compete because "rather than attempting to prevent plaintiff from competing for actuarial business, . . . [the provision] appear[ed] to prevent plaintiff from working as a custodian for any 'entity' which provide[d] 'actuarial services'").

36.     In considering these principles in the franchise context, the Court of Appeals has held that:

> [a]lthough the specific job description of the person sought to be restrained has been deemed less relevant when courts analyze a restriction placed on a business owner, we believe that the extent to which a particular contractual provision unreasonably impairs a former franchisee's ability to work in a related field or particular industry is relevant to the reasonableness of a non-competition restriction arising from the termination of a franchise agreement.

*Outdoor Lighting*, 228 N.C. App. at 622–23, 747 S.E.2d at 263.

37.     When interpreting the scope of the restrictions in a covenant not to compete, North Carolina courts follow basic rules of contract construction. "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract, so that if the language is clear and only one reasonable interpretation exists, the courts must enforce the contract as written." *Id.* at 628, 747 S.E.2d at 267 (internal quotation marks omitted). "When the language in a contract is ambiguous, we view the practical result of the restriction by 'construing the restriction strictly against its draftsman[.]'" *Elec. S., Inc. v. Lewis*, 96 N.C. App. 160, 167, 385 S.E.2d 352, 356 (1989) (quoting *Manpower of Guilford Cty., Inc. v. Hedgecock*, 42 N.C. App. 515, 522, 257 S.E.2d 109, 115 (1979)).

38.     Here, the Non-compete precludes Salinas and Gang Group from working in any capacity for the following:

> any other business conducting residential or commercial cleaning services including window cleaning, blind cleaning, gutter cleaning and high pressure spray applications or any business which is the same, similar to or competitive with [Window Gang] and the WINDOW GANG Franchise System within a radius of 50 miles of [the] Operating Territory.

(2007 Franchise Agreement § 16.5.) Thus, by the Non-compete's own terms, the prohibition extends to businesses that are "the same" or "similar to" Window Gang and its system, not simply to those that are "competitive" with Window Gang. This feature alone makes the Non-compete overbroad and unenforceable. *See, e.g.*, *Outdoor Lighting*, 228 N.C. App. at 628, 747 S.E.2d at 267 (finding unenforceable a non-compete restricting franchisee from having any involvement in any business "operating in competition with an outdoor lighting business" or any business "similar" to the franchisee's as it went "well beyond the prohibition of activities that would put [franchisee] in competition with [franchisor]").

39. Furthermore, Salinas and Gang Group are restricted from working for those prohibited businesses in any capacity whatsoever—not simply in roles which would cause competitive harm to Window Gang or only in divisions of those businesses which compete with Window Gang. On this basis, too, the Non-compete is overbroad and unenforceable. *See, e.g.*, *id.* at 629, 747 S.E.2d at 267 (holding non-compete preventing franchisee from working for a competitor in an area which did not compete with franchisor's business impermissibly "prevent[ed] [franchisee] from engaging in activities that [had] no tendency to adversely affect [franchisor's] legitimate business interests"); *VisionAIR*, 167 N.C. App. at 508–09, 606 S.E.2d at 362–63 (finding covenant unenforceable because it prevented former employee from performing "wholly unrelated work" at a similar firm); *Sandhills*, 2016 NCBC LEXIS 61, at *15 (granting motion to dismiss and finding covenant "overly broad because it effectively prohibits [former employees] from obtaining employment with any other company in

the home health business in any North Carolina county in which [former employer] provides services"); *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *42–43 (N.C. Super. Ct. Nov. 3, 2011) (granting motion to dismiss and finding invalid a provision that would have prevented employee "from working for a competitor in the wood coatings industry in a position wholly outside the scope of his" previous employment).[4]

40.     Window Gang seeks to salvage its claim by urging the Court to "blue pencil" the Non-compete to render it enforceable.  (Pl.'s Resp. Br. 12.)  Blue-penciling is the process by which "a court of equity will take notice of the divisions the parties themselves have made [in a covenant not to compete], and enforce the restrictions in the territorial divisions deemed reasonable and refuse to enforce them in the divisions deemed unreasonable." *Welcome Wagon Int'l, Inc. v. Pender*, 255 N.C. 244, 248, 120 S.E.2d 739, 742 (1961).  The blue pencil rule, however, "severely limits what the court may do to alter the covenant." *Hartman*, 117 N.C. App. at 317, 450 S.E.2d at 920.  As a general rule, "[t]he courts will not rewrite a contract if it is too broad but will simply not enforce it." *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 528, 379 S.E.2d

---

[4] Window Gang relies heavily on the Court of Appeals' decision in *Precision Walls, Inc. v. Servie*, 152 N.C. App. 630, 568 S.E.2d 267 (2002), to argue that the  "any capacity" language found to be enforceable in that case compels the conclusion that the "any capacity" language in the Non-compete is likewise enforceable.  As this Court has explained, however, "the holding of *Precision Walls* is narrow and confined to its unique facts." *InVue Sec. Prods. v. Stein*, 2017 NCBC LEXIS 115, at *14 (N.C. Super. Ct. Dec. 18, 2017); *see also Asheboro Paper & Packaging, Inc. v. Dickinson*, 599 F. Supp. 2d 664, 675 (M.D.N.C. 2009) (distinguishing *Precision Walls*); *Horner Int'l Co. v. McKoy*, 232 N.C. App. 559, 566, 754 S.E.2d 852, 857 (2014) (noting that *Precision Walls* was "largely inapposite" to the case before it); *CopyPro, Inc. v. Musgrove*, 232 N.C. App. 194, 203, 754 S.E.2d 188, 194 (2014) (concluding "that *Precision Walls* does not control the outcome in this case"); *VisionAIR*, 167 N.C. App. at 509 & n.1, 606 S.E.2d at 362–63 & n.1 (distinguishing *Precision Walls*).

824, 828 (1989); *see, e.g.*, *Beverage Sys.*, 368 N.C. at 699, 784 S.E.2d at 461 ("[W]hen an agreement not to compete is found to be unreasonable, we have held that the court is powerless unilaterally to amend the terms of the contract.").

41.     "A court at most may choose not to enforce a distinctly separable part of a covenant in order to render the provision reasonable.  It may not otherwise revise or rewrite the covenant."  *Hartman*, 117 N.C. App. at 317, 450 S.E.2d at 920.  In particular, the Court "may not resurrect, in whole cloth, a covenant not to compete by erasing and replacing offending, but key, portions of a contract."  *Prof'l Liab. Consultants, Inc. v. Todd*, 122 N.C. App. 212, 221, 468 S.E.2d 578, 584 (Smith, J., dissenting), *dissent adopted per curiam*, 345 N.C. 176, 478 S.E.2d 201 (1996).

42.     At oral argument, Window Gang suggested that the Court could render the Non-compete reasonable by striking language as follows:

> will not have any interest as an owner (except of publicly traded securities that are traded on a stock exchange or on the over-the-counter market), partner, director, officer, ~~employee, consultant, representative or agent, or in any other capacity,~~ in any other business conducting residential or commercial cleaning services including window cleaning, blind cleaning, gutter cleaning and high pressure spray applications ~~or any business~~ which is the same, similar to or competitive with [Window Gang] and the WINDOW GANG Franchise System within a radius of 50 miles of Your Operating Territory.

43.     While less restrictive, Window Gang's proposed blue penciling does nothing to remedy the Non-compete's overly broad language precluding Salinas and Gang Group from working for a business which is the "same [or] similar to," but not "competitive" with, Window Gang.  Accordingly, for the reasons set forth above, the Court concludes that Window Gang's breach of contract claim against Salinas, Gang

Group, and the Affiliated Defendants for breach of the Non-compete fails as a matter of law and should be dismissed.

B. Conversion

44. Window Gang has asserted a conversion claim against all Defendants for allegedly retaining and destroying certain Window Gang Property. (Am. Compl. ¶¶ 152–55.) Defendants contend that application of the economic loss rule mandates dismissal of Window Gang's conversion claim. North Carolina's economic loss rule derives from the proposition that "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." *N.C. State Ports Auth. v. Lloyd A. Fry Roofing, Co.*, 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978).[5] The rule provides "limitations on the recovery in tort when a contract exists between the

---

[5] *Ports Authority* recognized four exceptions to this general rule:

> (1)    The injury, proximately caused by the promisor's negligent act or omission in the performance of his contract, was an injury to the person or property of someone other than the promisee.

> (2)    The injury, proximately caused by the promisor's negligent, or wilful, act or omission in the performance of his contract, was to property of the promisee other than the property which was the subject of the contract, or was a personal injury to the promisee.

> (3)    The injury, proximately caused by the promisor's negligent, or wilful, act or omission in the performance of his contract, was loss of or damage to the promisee's property, which was the subject of the contract, the promisor being charged by law, as a matter of public policy, with the duty to use care in the safeguarding of the property from harm, as in the case of a common carrier, an innkeeper or other bailee.

> (4)    The injury so caused was a wilful injury to or a conversion of the property of the promisee, which was the subject of the contract, by the promisor.

*Id.* at 82, 240 S.E.2d at 350–51 (internal citations omitted).

parties that defines the standard of conduct and which the courts believe should set the measure of recovery." *Akzo Nobel Coatings*, 2011 NCBC LEXIS 42, at *47–48. In short, the economic loss rule precludes a tort action

> against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract.

*Forest2Market, Inc. v. Arcogent, Inc.*, 2016 NCBC LEXIS 3, at *7–8 (N.C. Super. Ct. Jan. 5, 2016) (quoting *Spillman v. Am. Homes of Mocksville, Inc.*, 108 N.C. App. 63, 65, 422 S.E.2d 740, 741–42 (1992)).

45. To maintain a tort claim for conduct "also alleged to be a breach of contract," the plaintiff must show "a duty owed by the defendant separate and distinct from any duty owed under a contract." *Id.* at *8 (quoting *Akzo Nobel Coatings*, 2011 NCBC LEXIS 42, at *47–48). The tort claim "must be grounded on a violation of a *duty* imposed by operation of law, and the right invaded must be one that the law provides without regard to the contractual relationship of the parties." *Rountree v. Chowan County*, 796 S.E.2d 827, 831 (N.C. Ct. App. 2017) (quoting *Asheville Contracting Co., Inc. v. City of Wilson*, 62 N.C. App. 329, 342, 303 S.E.2d 365, 373 (1983)). Typically, "the tortious conduct must have an aggravating element such as malice or recklessness[.]" *Strum v. Exxon Co., USA*, 15 F.3d 327, 331 (4th Cir. 1994); *see also Newton v. Standard Fire Ins. Co.*, 291 N.C. 105, 112, 229 S.E.2d 297, 301 (1976) ("Such aggravated conduct was early defined to include 'fraud, malice, such a degree of negligence as indicates a reckless indifference to consequences, oppression, insult, rudeness, caprice, [and] willfulness[.]'").

46. The economic loss rule does not apply to all tort claims, however. As recently explained by the Court of Appeals in *Bradley Woodcraft, Inc. v. Bodden*, "while claims for negligence are barred by the economic loss rule where a valid contract exists between the litigants, claims for fraud are not so barred, and indeed, '[t]he law is, in fact, to the contrary: a plaintiff may assert both claims[.]'" 251 N.C. App. 27, 34, 795 S.E.2d 253, 258 (2016) (quoting *Jones v. Harrelson & Smith Contractors, LLC*, 194 N.C. App. 203, 215, 670 S.E.2d 242, 250 (2008)). Of particular significance here, *Bradley Woodcraft* did not answer whether the economic loss rule may extend to bar intentional tort claims other than fraud.

47. While the *Bradley Woodcraft* court observed in dicta that "*Ports Authority* and analogous cases applying the economic loss rule are limited in scope to claims for negligence," *id.* at 34, 795 S.E.2d at 259, suggesting that the rule has no application to intentional torts generally, federal courts interpreting *Bradley Woodcraft* have rejected the contention that the Court of Appeals intended to limit *Ports Authority* and North Carolina's economic loss rule to bar only negligence claims, *see, e.g.*, *Legacy Data Access, Inc. v. Cadrillion, LLC*, 889 F.3d 158, 166 (4th Cir. 2018) (interpreting *Bradley Woodcraft* as "simply another application of the principle that the economic loss rule does not bar tort claims based on an independent legal duty, which is 'identifiable and distinct' from the contractual duty"); *Foodbuy, LLC v. Gregory Packaging, Inc.*, No. 3:16-cv-00809-FDW-DCK, 2018 U.S. Dist. LEXIS 164189, at *81–82 (W.D.N.C. Sept. 25, 2018) (relying on *Legacy Data* in barring claims for tortious interference with contract and unfair and deceptive trade practices).

48. Those courts have recognized that "[i]n preventing parties from asserting tort claims for a simple breach of contract, the economic loss rule thus 'encourages contracting parties to allocate risks for economic loss themselves.'" *Legacy Data*, 889 F.3d at 164 (quoting *Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635, 639, 643 S.E.2d 28, 30 (2007)); *see also Moore v. Coachmen Indus., Inc.*, 129 N.C. App. 389, 402, 499 S.E.2d 772, 780 (1998) ("To give a party a remedy in tort . . . would permit the party to ignore and avoid the rights and remedies granted or imposed by the parties' contract."). Focusing on the fact that *Ports Authority* involved a bailee and that "[a] *bailee* has a legal duty . . . independent of any contractual duty," the Fourth Circuit has persuasively reconciled *Bradley Woodcraft* with *Ports Authority* to conclude that "[w]hat matters is not whether a plaintiff has alleged a negligence tort or an intentional tort, but whether the defendant has breached some duty other than a contractual duty, such that the tort claim is 'identifiable and distinct' from the breach of contract claim." *Legacy Data*, 889 F.3d at 165–66 (noting that in *Bradley Woodcraft* the defendant's counterclaim for fraud was identifiable and distinct from the breach of contract claim "because the plaintiff not only failed to complete work required under the contract[,] . . . but had no intention of doing so from the very beginning").

49. Under North Carolina law, "[t]he tort of conversion is well defined as an 'unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights.'" *Variety Wholesalers, Inc. v. Salem Logistics Traffic*

*Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (quoting *Peed v. Burleson's, Inc.*, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956)). "There are, in effect, two essential elements of a conversion claim: ownership in the plaintiff and wrongful possession or conversion by the defendant." *Id.*

50. Window Gang's conversion claim against Defendants is based on two broad sets of alleged misconduct: (i) Defendants' failure to return Window Gang property, as defined by and required under sections 16.2 and 16.3 of the 2007 Franchise Agreement, (Am. Compl. ¶¶ 26, 152, 154),[6] and (ii) Defendants' destruction of thousands of files in the Google Account, which Window Gang claims to own under the 2007 Franchise Agreement and which Window Gang alleges Defendants were either required to return under that agreement or make available to Window Gang through discovery in this litigation, (*see* Am. Compl. ¶¶ 4, 78, 84). To avoid application of the economic loss rule on the pleaded facts, Window Gang relies upon *Ports Authority*'s fourth exception to the general rule that "a breach of contract does not give rise to a tort action by the promisee against the promisor," contending that the alleged facts show "[t]he injury so caused was a [willful] injury to or a conversion of the property of the promisee, which was the subject of the contract, by the promisor." *Ports Auth.*, 294 N.C. at 82, 240 S.E.2d at 351.

---

[6] Under Section 16.2 of the 2007 Franchise Agreement, Defendants agreed that upon termination of the franchise relationship, Defendants would be obligated to return Window Gang's "Confidential Operations Manual and all copies of other Manuals, or other WINDOW GANG items." Under Section 16.3 of that agreement, Defendants similarly agreed to "return to [Window Gang] all signs, catalogues, advertising materials, forms, invoices, and other materials containing the WINDOW GANG Names and the Marks or otherwise relating to the Franchise[.]"

51. Although at first blush the fourth exception would seem to permit Window Gang's conversion claim here, the cases the Supreme Court relied upon in stating the fourth exception in *Ports Authority* involve bailments—relationships in which the promisor/bailee had a legal duty independent of the parties' contract to return the promisee/bailor's property. *Id.* (first citing *Williamson v. Dickens*, 27 N.C. 259 (1844) (conversion of notes by a bailee for collection); then citing *Simmons v. Sikes*, 24 N.C. 98 (1841) (conversion or willful destruction of a canoe by a bailee)); *see also Legacy Data*, 889 F.3d at 165–66 (recognizing that because a "bailee has a legal duty . . . independent of any contractual duty," "a conversion action can be brought against him in addition to any breach of contract claim").

52. As such, the Court does not read the fourth exception as eliminating the requirement that "a plaintiff must allege a duty owed to him by the defendant separate and distinct from any duty owed under a contract," *Akzo Nobel Coatings*, 2011 NCBC LEXIS 42, at *48 (quoting *Kelly v. Georgia Pacific LLC*, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009)), to avoid the dismissal of a conversion claim under the economic loss rule, *see Legacy Data*, 889 F.3d at 166 ("[W]here a defendant simply violates a contractual provision and undertakes no independent legal duty, like that of a bailee, the economic loss rule applies to bar tort claims such as conversion." (emphasis omitted)).

53. Window Gang has not alleged a duty independent of the duties owed by Salinas, Gang Group, and the Affiliated Defendants under the 2007 Franchise Agreement as a basis for its conversion claim against them. Rather, the Amended

Complaint makes clear that the duty of those Defendants to return the property Window Gang alleges they have converted is a duty arising and owed under the 2007 Franchise Agreement, and the agreement itself defines what is and is not Window Gang's property. (*See* Am. Compl. ¶¶ 26, 35, 78, 118; 2007 Franchise Agreement §§ 11, 13.1, 16.2, 16.3, 16.4.)

54. As a result, the Court concludes that Window Gang's conversion claim against Salinas, Gang Group, and the Affiliated Defendants should be dismissed under the economic loss rule for failure to plead a duty independent of contract to support that claim. *See, e.g., Rountree*, 796 S.E.2d at 831 (applying economic loss rule to affirm dismissal of tort claim for failure to prove independent duty); *Akzo Nobel Coatings*, 2011 NCBC LEXIS 42, at *55–59 (applying economic loss rule to dismiss tort claims for failure to plead independent duty); *see also Legacy Data*, 889 F.3d at 165 (applying economic loss rule to dismiss conversion claim under North Carolina law where claim based on failure to pay sums due under a contract); *Planet Earth TV, LLC v. Level 3 Commc'ns, LLC*, No. 1:17-cv-00090-MR-DLH, 2018 U.S. Dist. LEXIS 129920, at *5–6 (W.D.N.C. Aug. 2, 2018) ("Because the Plaintiff's conversion claim is coterminous with its breach of contract claim, the Court concludes that the claim for conversion is barred by the economic loss rule.").

55. The result is different for Window Ninjas. Because Window Ninjas never entered a contract with Window Gang, Window Gang has "no basis for recovery in contract" against Window Ninjas. *See Lord*, 182 N.C. App. at 642, 643 S.E.2d at 32. Thus, the economic loss rule will not bar Window Gang's conversion claim against

Window Ninjas. *See id.* at 643, 643 S.E.2d at 33 (holding that "[b]ecause there was no contract between [plaintiff] and [defendants] . . . the economic loss rule does not apply" to bar plaintiff's tort claims); *see also Ellis-Don Constr., Inc. v. HKS, Inc.*, 353 F. Supp. 2d 603, 606 (M.D.N.C. 2004) (holding that North Carolina's economic loss rule "does not limit tort actions that arise in the absence of a contract").

56. Window Ninjas also contends, for the first time in its Reply Brief, that Window Gang's conversion claim should be dismissed because Window Gang has failed to allege that Window Ninjas took possession of Window Gang's property. (Defs.' Reply Mem. 7, ECF No. 59.) Under North Carolina law, however, "[t]he essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner[.]" *Bartlett Milling Co. v. Walnut Grove Auction & Realty Co., Inc.*, 192 N.C. App. 74, 86, 665 S.E.2d 478, 488 (2008) (quoting *Lake Mary Ltd. P'ship v. Johnston*, 145 N.C. App. 525, 532, 551 S.E.2d 546, 552 (2001)). In essence, "there is no conversion until some act is done which is a denial or violation of the plaintiff's dominion over or rights in the property." *Mace v. Pyatt*, 203 N.C. App. 245, 256, 691 S.E.2d 81, 90 (2010) (quoting *Lake Mary Ltd. P'ship*, 145 N.C. App. at 532, 551 S.E.2d at 552).

57. Here, Window Gang has pleaded, among other things, that Window Ninjas failed to return "signs, catalogues, advertising materials, forms, invoices and other materials containing the WINDOW GANG names and the Marks or otherwise relating to the Franchise," (Am. Compl. ¶ 78), all of which Window Gang claims to own under the 2007 Franchise Agreement. These allegations describe a wrongful

deprivation of tangible property which may support a conversion claim. *See, e.g.*, *S.E. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 331, 572 S.E.2d 200, 207 (2002) (permitting conversion claim where defendants allegedly removed plaintiffs' tangible property); *see also Comp. Design & Integration, LLC v. Brown*, 2018 NCBC LEXIS 216, at *68 (N.C. Super. Ct. Dec. 10, 2018) (holding that tangible "customer records, invoices, sales histories, sales forecasts, and employee records" were proper subjects of a conversion claim).

58. Similarly, Window Gang has pleaded that Window Ninjas permanently deleted and thus destroyed "all the files off the [Google Account] that contained the name or mark for Window Gang," (Am. Compl. ¶¶ 96, 99, 157), property Window Gang also contends it owns under the parties' contract, (Am. Compl. ¶ 86). These allegations are likewise sufficient to sustain a conversion claim. *See, e.g.*, *Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 51, at *19–20 (N.C. Super. Ct. June 9, 2017) (holding that "deletion of [electronic] documents may pose a deprivation to the owner sufficient to give rise to a conversion claim" where it is "unclear on the face of the complaint whether and to what extent [the plaintiff] may restore its deleted data"). For each of these reasons, the Court concludes that Window Gang's conversion claim against Window Ninjas should survive dismissal under Rule 12(b)(6).

C.   Tortious Interference Claims

59.   Window Gang alleges claims for tortious interference with contract and with prospective economic advantage against all Defendants.  (*See* Am. Compl. ¶¶ 139–150.)  To state a claim for tortious interference with contract, a plaintiff must allege:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Labs*, 322 N.C. at 661, 370 S.E.2d at 387.  To allege a claim for tortious interference with prospective economic advantage, a plaintiff "must allege facts to show that the defendants acted without justification in 'inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference.'"  *Walker v. Sloan*, 137 N.C. App. 387, 393, 529 S.E.2d 236, 242 (2000) (quoting *Cameron v. New Hanover Mem'l Hosp.*, 58 N.C. App. 414, 440, 293 S.E.2d 901, 917 (1982)).

60.   Defendants contend that Window Gang's claim for tortious interference with contract must be dismissed because Window Gang has failed to allege that Defendants induced the breach of an existing contract, alleging instead only unsuccessful attempts to induce a breach.  (Defs.' Mot. Dismiss Br. 22.)  The Court agrees.  To support its claim, Window Gang alleges two unsuccessful customer solicitations, (Am. Compl. ¶¶ 140–42, 143–45), and makes a general conclusory assertion that any dealing between Defendants and a customer who previously did business with Window Gang "involves a contract that Defendants tortiously

interfered with," (Am. Compl. ¶ 147).  Nowhere, however, does Window Gang allege that any Defendant intentionally induced the breach of a customer's contract with Window Gang.  As such, Window Gang's tortious interference with contract claim must be dismissed.  *See, e.g.*, *United Labs.*, 322 N.C. at 661, 370 S.E.2d at 387 (requiring plaintiff to allege "defendant intentionally induce[d] the third person not to perform the contract").

61.  Defendants argue that Window Gang's claim for tortious interference with prospective economic advantage should also be dismissed for failure "to identify evidence of any specific contractual opportunities lost."  (Defs.' Reply Mem. 7); *see Beverage Sys.*, 368 N.C. at 701–02, 748 S.E.2d at 463 (dismissing prospective economic advantage claim, in part, because plaintiff failed to identify "a particular business with which it lost an economic advantage"); *see also Artistic S. Inc. v. Lund*, 2015 NCBC LEXIS 113, at *31–32 (N.C. Super. Ct. Dec. 9, 2015) (dismissing claim for tortious interference with prospective economic advantage where plaintiff did not allege interference with a "specific potential contract").  On this claim, however, the Court disagrees on the facts alleged.

62.  In particular, Window Gang alleges and attaches to its Amended Complaint an e-mail exchange with a customer who contacted Window Ninjas in an effort to contact Window Gang and thereafter executed a work order with Window Ninjas after Window Ninjas advised her that Window Ninjas was "the same company, new name[.]"  (Am. Compl. ¶ 61; Am. Compl. Ex. 9, ECF No. 39.9.)  The Court concludes that Window Gang's allegations survive scrutiny under Rule 12(b)(6) because they

state facts permitting a jury to conclude that Defendants have "maliciously induc[ed] a person not to enter into a contract with [Window Gang], which [she] would have entered into but for [Window Ninjas'] interference," resulting in financial loss to Window Gang. *Beverage Sys.*, 368 N.C. at 701, 748 S.E.2d at 463; *see also Coleman v. Whisnant*, 225 N.C. 494, 506, 35 S.E.2d 647, 656 (1945) ("[U]nlawful interference with the freedom to contract is actionable" when it maliciously "prevent[s] the making of a contract . . . with design to injure the plaintiff, or gain[] some advantage at [plaintiff's] expense.").

63.     Defendants also argue that the economic loss rule requires dismissal of Window Gang's tortious interference claims because both claims are based on Defendants' alleged failure to comply with the non-solicitation provision in the 2007 Franchise Agreement, which precluded solicitation of certain Window Gang customers.     Defendants contend that Window Gang's failure to allege a duty "separate and distinct" from Defendants' obligation under the 2007 Franchise Agreement is fatal to its claim.  The Court disagrees.

64.     Here, Window Gang's tortious interference claims are not only predicated on Defendants' alleged breach of the 2007 Franchise Agreement, but also on allegations that Defendants "fraudulently divert[ed] payments for work performed by Window Gang" and "caused damage to the reputation and goodwill of the company" through that conduct.  (Am. Compl. ¶ 146.)  Because Window Gang's tortious interference claims rest upon allegations based in fraud, the Court concludes that the economic loss rule does not bar Window Gang's tortious interference claims as

pleaded here. *See, e.g.*, *ITW Charlotte, LLC v. ITW Commercial Constr., N. Am.*, No. 3:17-cv-00473-FDW-DCK, 2017 U.S. Dist. LEXIS 173712, at *11 (W.D.N.C. Oct. 20, 2017) (finding economic loss rule did not require dismissal of tortious interference claims under North Carolina law where "no breach claim simultaneously encompass[ed] the conduct underlying [plaintiff's] tort claims" and defendant's "willful conduct" harmed plaintiff's contract with a third party); *BioSignia, Inc. v. Life Line Screening of Am., Ltd.*, No. 1:12CV1129, 2014 U.S. Dist. LEXIS 89678, at *25 (M.D.N.C. June 30, 2014) (finding economic loss rule inapplicable to tortious interference claims under North Carolina law where plaintiff "allege[d] damages for the tort claim which are distinct from the damages sought for breach of contract").

65. Accordingly, for the reasons set forth above, the Court concludes that Defendants' Motion should be granted as to Window Gang's claim for tortious interference with contract but denied as to Window Gang's claim for tortious interference with prospective economic advantage.

D. Misappropriation of Trade Secrets

66. Window Gang alleges trade secret misappropriation against all Defendants under the North Carolina Trade Secrets Protection Act ("NCTSPA"), N.C. Gen. Stat. § 66-152, *et. seq.* (*See* Am. Compl. ¶¶ 121–29.) Under the NCTSPA, an "owner of a trade secret shall have remedy by civil action for misappropriation of his trade secret." N.C. Gen. Stat. § 66-153. "Misappropriation" for these purposes is the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent

development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." *Id.* § 66-152(1).

67. A "trade secret" under the NCTSPA consists of "business or technical information" that:

a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 66-152(3).

68. As to burden of proof, the NCTSPA provides as follows:

Misappropriation of a trade secret is prima facie established by the introduction of substantial evidence that the person against whom relief is sought both: (1) Knows or should have known of the trade secret; and (2) Has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner.

*Id.* § 66-155.

69. Window Gang alleges that it has developed trade secrets "through over thirty years of market and customer development, research, effort, and significant financial investment." (Am. Compl. ¶¶ 20, 122.) Window Gang specifically avers that its trade secrets include, but are not limited to:

its pricing and estimation methods; its step-by-step service manual; its employee manual; its operations manual and guidelines and recommendations for operating a successful franchise; compiled customer information, including the identity of potential customers and specifications provided by customers to Window Gang; and information regarding its proprietary equipment and chemical cleaning solutions.

(Am. Compl. ¶ 21.)[7]

70. Defendants first contend that Window Gang has not alleged its trade secret claim with the particularity required under North Carolina law. (Defs.' Mot. Dismiss Br. 15.) The Court agrees as to some, but not all, of Window Gang's allegations.

71. Our Supreme Court recently noted that "[t]o plead misappropriation of trade secrets, a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec v. Manly*, 370 N.C. 602, 609, 811 S.E.2d 542, 547–48 (2018) (quoting *Washburn v. Yadkin Valley Bank & Tr. Co.*, 190 N.C. App. 315, 326, 660 S.E.2d 577, 585 (2008)). More broadly, "a complaint that makes general allegations in sweeping and conclusory statements, without specifically identifying the trade secrets allegedly misappropriated, is 'insufficient to state a claim for misappropriation of trade secrets.'" *Washburn*, 190 N.C. App. at 327, 660 S.E.2d at 585–86 (quoting *VisionAIR*, 167 N.C. App. at 511, 606 S.E.2d at 364).

72. Applying these standards here, and recognizing that a different standard will be applied under Rule 56, the Court concludes that Window Gang has failed to

---

[7] Window Gang originally claimed trade secret protection for its "System," which it defined as its:

> distinctive system for the operation, marketing, promoting, advertising and management of a cleaning services business including distinguishing characteristics using proprietary knowledge, procedures, specifications for equipment, systems forms, printed material, applications, specifications, standards and techniques.

(Am. Compl. ¶ 21.) Window Gang subsequently abandoned this contention at the Hearing.

satisfy its pleading burden as to some of its alleged trade secrets but satisfactorily, albeit minimally, pleaded its misappropriation claim as to others under Rule 12(b)(6).

73. To begin with, all but one of Window Gang's "specific" trade secrets set forth at paragraph 21 of the Amended Complaint meets *Krawiec'*s particularity requirements.

74. First, "compiled customer information, including the identity of potential customers and specifications provided by customers to Window Gang" is the sort of non-public information,[8] described with the sort of particularity, that our appellate courts have found sufficient to withstand scrutiny under Rule 12(b)(6). *See, e.g., Krawiec*, 370 N.C. at 610, 811 S.E.2d at 548 ("[W]e agree with the determination of the Court of Appeals that 'information regarding customer lists . . . can qualify as a trade secret under [section] 66-152(3).'" (quoting *Area Landscaping, LLC. v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 525, 586 S.E.2d 507, 511 (2003))); *see also Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC*, 174 N.C. App. 49, 56, 620 S.E.2d 222, 228 (2005) (concluding that a compilation of business information, including plaintiff's "customer information (identity, contacts and requirements of its rental customers)," constituted a trade secret); *S. Fastening Sys., Inc. v. Grabber Constr.*

---

[8] As pleaded, the Court cannot agree with Defendants that the compiled customer information is basic information readily ascertainable from public sources as a matter of law. *See, e.g., NovaCare Orthotics & Prosthetics E., Inc. v. Speelman*, 137 N.C. App. 471, 478, 528 S.E.2d 918, 922 (2000) (rejecting trade secret status for customer list and customer data compilation because "any information used to contact the clients would have been easily accessible to defendant through a local telephone book"); *Bldg. Ctr., Inc. v. Carter Lumber of the N., Inc.*, 2017 NCBC LEXIS 85, at *20 (N.C. Super. Ct. Sept. 21, 2017) (noting that North Carolina law "does not consider a customer list containing only information that is easily accessible through a telephone book or other readily available sources to be a trade secret").

*Prods., Inc.*, 2015 NCBC LEXIS 42, at *11 (N.C. Super. Ct. Apr. 28, 2015) (recognizing that "confidential customer information" such as customer contact information and "customer buying preferences and history" may constitute trade secrets); *Koch Measurement Devices, Inc. v. Armke*, 2013 NCBC LEXIS 45, at *8 (N.C. Super. Ct. Oct. 14, 2013) (holding "customer lists including names, contact persons, addresses and phone number[s and] the ordering habits, history, and needs of . . . customers" may constitute trade secrets).

75.    The same is true at the Rule 12(b)(6) stage for Window Gang's "pricing and estimation methods." *See, e.g.*, *Krawiec*, 370 N.C. at 610, 811 S.E.2d at 548 (holding "information regarding . . . pricing formulas and bidding formulas can qualify as a trade secret"); *GE Betz, Inc. v. Conrad*, 231 N.C. App. 214, 234, 752 S.E.2d 634, 649 (2013) (finding "pricing information, customer proposals, historical costs, and sales data" to constitute trade secrets); *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 375, 542 S.E.2d 689, 692 (2001) ("Confidential data regarding operating and pricing policies can also qualify as trade secrets.").

76.    Window Gang's allegations regarding its step-by-step service manual, employee manual, and operations manual, guidelines, and recommendations for operating a successful franchise are likewise sufficient.  Although in relatively meager fashion, the Court concludes that, for purposes of Rule 12(b)(6), Window Gang has identified and described these discrete trade secrets with "sufficient particularity so as to enable [Defendants] to delineate that which [they are] accused of misappropriating and [this Court] to determine whether misappropriation has or is

threatened to occur." *Krawiec*, 370 N.C. at 609, 811 S.E.2d at 547–48; *see also, e.g.*, *S. Fastening Sys.*, 2015 NCBC LEXIS 42, at *11 (training manuals may constitute a trade secret); *Koch*, 2013 NCBC LEXIS 45, at *8–10 (business methods and opportunities may be trade secrets); *Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC*, 2002 NCBC LEXIS 2, at *41–42 (N.C. Super. Ct. July 10, 2002) ("Business plans, marketing strategies, and customer information represent the type of information that, when accumulated over time, can be extremely valuable to competitors [and can qualify as trade secrets].").

77. In contrast, however, the Court cannot conclude that Window Gang's purported trade secret consisting of "[i]nformation regarding its proprietary equipment and chemical cleaning solutions," (Am. Compl. ¶ 21), is identified with sufficient particularity to satisfy Window Gang's pleading obligation under *Krawiec*. This description is vague, imprecise, and as nonspecific as the "original ideas and concepts for dance productions" found deficient in *Krawiec*. *See Krawiec*, 370 N.C. at 611, 811 S.E.2d at 549. While certain "chemical formulations" may constitute a trade secret, *see, e.g.*, *GE Betz*, 231 N.C. App. at 234, 752 S.E.2d at 649, Window Gang's identification here is so general that it leaves Defendants entirely in the dark as to what information about what proprietary equipment and what chemical cleaning solutions they are alleged to have misappropriated. As such, this aspect of Window Gang's misappropriation claim must be dismissed.

78. The Court turns next to whether Window Gang has alleged that it has taken reasonable steps to keep its trade secrets confidential. Our courts have held that the

reasonableness of a plaintiff's efforts to maintain secrecy are "necessarily fact dependent" and that a trial court must "closely examine the circumstances surrounding the trade secret." *See Koch*, 2015 NCBC LEXIS 45, at *15.

79. Here, the 2007 Franchise Agreement contains a confidentiality provision stating that the franchisee and anyone who works in connection with the franchise shall keep confidential the contents of "the [Operations] Manual, specifications, techniques, training materials, operation procedures, tape and films, computer software, client lists and other data[.]" (2007 Franchise Agreement § 12.1.) The 2007 Franchise Agreement further requires the franchisee to require anyone operating in a "managerial or supervisory position" to sign a confidentiality agreement. (*See* 2007 Franchise Agreement § 12.2.)

80. While these measures to protect the secrecy of Window Gang's alleged trade secrets are not extensive, the Court concludes they are sufficient to survive Defendants' Motion under the circumstances of the franchise relationship at issue here. *See, e.g.*, *Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 200 F. Supp. 2d 541, 546 (M.D.N.C. 2002) (recognizing that under North Carolina law "confidentiality agreements are one method used to protect confidential information"); *Daniel Grp., Inc. v. Am. Sales & Mktg., Inc.*, 2016 NCBC LEXIS 112, at *28 (N.C. Super. Ct. Dec. 15, 2016) (dismissing trade secrets claim for failure to plead reasonable efforts to maintain secrecy where only effort involved plaintiff's requirement that sales representatives generally, but not defendants in particular, sign confidentiality agreements).

81. Defendants also contend that Window Gang has not identified how Defendants misappropriated its alleged trade secrets. (Defs.' Mot. Dismiss Br. 17.) Window Gang alleges, however, that Defendants failed to return the trade secret information provided to them under the 2007 Franchise Agreement, including the operations and step-by-step service manuals, after the expiration of the 2007 Franchise Agreement, (*see* Am. Compl. ¶¶ 24, 26–27, 111), and also that Defendants have disclosed and used Window Gang's customer and pricing information in the conduct of the Window Ninjas business, (*see* Am. Compl. ¶ 75). These allegations are sufficient to satisfy Rule 12(b)(6). *See* N.C. Gen. Stat. § 66-152(1) (defining misappropriation as the "acquisition, disclosure, or use of the trade secret of another without express or implied authority or consent").

82. Based on the above, the Court concludes that Defendants' Motion should be granted as to Window Gang's misappropriation claim against all Defendants concerning Window Gang's "[i]nformation regarding its proprietary equipment and chemical cleaning solutions." (Am. Compl. ¶ 21.) Otherwise, as to this claim, the Motion should be denied.

E.    Trademark Infringement

83. Window Gang alleges a claim for trademark infringement against Salinas, Gang Group, and Window Ninjas (the "Infringement Defendants") under two sections of the North Carolina Trademark Registration Act (the "NCTRA"), N.C. Gen. Stat. §§ 80-11 and 80-13. (*See* Am. Compl. ¶¶ 130–38).

84.     To establish a claim for trademark infringement under section 80-11, a plaintiff must allege two elements: "(1) 'that it has a valid, [protectable] trademark'; and (2) 'that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers.'" *Windsor Jewelers, Inc. v. Windsor Fine Jewelers, LLC*, 2009 NCBC LEXIS 19, at *14 (N.C. Super. Ct. Feb. 16, 2009) (quoting *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 (4th Cir. 1995)).[9] Section 80-13, on the other hand, does not authorize a statutory cause of action and simply provides, in its entirety, that the NCTRA shall not "adversely affect the rights or the enforcement of rights in marks acquired in good faith at any time at common law." The Court's analysis therefore addresses Window Gang's claim under section 80-11.

85.     For purposes of the NCTRA, a trademark is "any word, name, symbol, or device or any combination thereof adopted and used by a person to identify goods made, sold, or distributed by him and to distinguish them from goods made, sold, or distributed by others." N.C. Gen. Stat. § 80-1(f). "Use" of a trademark is defined as:

> the bona fide use of a mark in the State of North Carolina in the ordinary course of trade, and not merely the reservation of a right to a mark. . . . [A] mark shall be deemed to be "used" in this State . . . on services when it is used or displayed in the sale or advertising of services and the services are currently being rendered in this State, or are being offered and are available to be rendered in this State.

---

[9] The purpose of the NCTRA "is to provide a system of State trademark registration and protection substantially consistent with the federal system of trademark registration and protection under . . . 15 U.S.C. § 1051[.] The construction given the federal act should be examined as persuasive authority for interpreting and construing [the NCTRA]." N.C. Gen. Stat. § 80-1.1; *see, e.g., Ray Lackey Enters. v. Vill. Inn Lakeside, Inc.*, 2015 NCBC LEXIS 35, at *9 (N.C. Super. Ct. Apr. 2, 2015) (citing *Windsor Jewelers* and *Lone Star* for the elements of a section 80-11 claim).

*Id.* § 80-1(g).

86.     Window Gang has sufficiently alleged a valid, protectable trademark (the "Mark"). Not only has Window Gang alleged that it has a protectable interest in its Mark bearing North Carolina Registration Number 010399, but Window Gang has attached to the Amended Complaint the Secretary of State's Certificate of Registration, which describes the Mark as "Window Gang and Design of the Head of a Man with Sunglasses On, Hat and Trench Coat." (Am. Compl. ¶ 31; Am. Compl. Ex. 1, ECF No. 39.1.)[10] Window Gang has also pleaded that it has not abandoned the Mark. (Am. Compl. ¶ 134.)

87.     The Infringement Defendants do not challenge the validity of Window Gang's Mark but instead contend that Window Gang's infringement claim should be dismissed because (i) "there is only one specific allegation of the use of [Window Gang's] mark," which merely constitutes "de minimis" infringement, (ii) Window Gang has not pleaded actual confusion by any consumer, and (iii) Window Gang's allegations fall outside the scope of section 80-11 because the alleged infringement did not occur in connection with the sale or advertising of Defendants' services. (Defs.' Notice & Suppl. Mem. Law 3–5 [hereinafter "Defs.' Suppl. Br."], ECF No. 56.) The Court disagrees with each of these contentions.

88.     First, the number of specific instances of trademark infringement alleged is not determinative of an infringement claim's survival under Rule 12(b)(6). Indeed,

---

[10] The NCTRA provides that "[a]ny certificate of registration issued by the Secretary under the provisions hereof or a copy thereof duly certified by the Secretary shall be admissible in evidence as competent and sufficient proof of the registration of the mark in any action or judicial proceedings in any court of this State." *Id.* § 80-4.

the NCTRA does not impose a minimum number of infringement violations before an infringement claim may be brought. To the contrary, section 80-11 is written in the singular and provides that liability shall extend to "any person who shall . . . [u]se [a] copy . . . of a mark registered under this Article" or "any person [who] shall . . . [r]eproduce . . . any such mark and apply such reproduction . . . to labels[.]" N.C. Gen. Stat. § 80–11. The Court concludes that Window Gang's allegations of infringement are sufficient under Rule 12(b)(6) on this point.

89. Next, contrary to the Infringement Defendants' contention, Window Gang must plead only the likelihood of confusion, rather than actual confusion, to sustain its infringement claim. *See Windsor Jewelers*, 2009 NCBC LEXIS 19, at *14 (stating that section 80-11 requires that a "defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers"); *Shells Seafood Rests., Inc. v. Atari*, No. 1:96cv276-C, 1997 U.S. Dist. LEXIS 11157, at *7 (W.D.N.C. Feb. 4, 1997) (stating that for infringement claims, "[i]t is well settled that evidence of actual confusion is not necessary to the finding of a likelihood of confusion"); *see also Clear Defense, LLC v. Cleardefense Pest Control of Greensboro, LLC*, No. 1:17-cv-01139, 2018 U.S. Dist. LEXIS 182065, at *7 (M.D.N.C. Oct. 23, 2018) (noting with regard to infringement claims, "in the mine run of cases, a complaint will not be dismissed pursuant to Rule 12(b)(6) on the basis of an insufficient likelihood of confusion"). The Court concludes that Window Gang has satisfactorily pleaded likelihood of confusion for Rule 12(b)(6) purposes here. (*See* Am. Compl. ¶¶ 73, 135, 136; Am. Compl. Ex. 12, ECF No. 39.12.)

90.     Finally, that the alleged misconduct involved an invoice bearing Window Gang's trademark tendered after the work at issue was completed, (*see* Am. Compl. ¶ 73; Am. Compl. Ex. 12), is of no consequence on the facts pleaded.  Section 80-11 requires that the alleged improper use of a plaintiff's mark occur "in connection with the sale . . . of goods or services."  N.C. Gen. Stat. § 80-11(1).  The preparation and tendering of an invoice and the payment of the same is a common feature of the sales process.  Window Gang alleges that the Infringement Defendants billed customers for services the Infringement Defendants did not perform by sending invoices bearing Window Gang's name and Mark.  (Am. Comp. ¶¶ 72–73.)  Thus, the Infringement Defendants' contention that the use of Window Gang's Mark on Defendants' invoices falls outside the scope of section 80-11 is without merit.

91.     Defendants also make a single statement in their supplemental brief, without referencing the economic loss rule, that "any purported infringement would be covered by [Window Gang's] existing claim for breach of contract."  (Defs.' Supp. Br. 4).  To the extent Defendants intend this reference to advance the economic loss rule as a ground for dismissal of Window Gang's infringement claim, the Court denies Defendants' Motion.  Window Gang's ownership of its Mark does not arise from the 2007 Franchise Agreement, and its infringement claim is based on the legal duty of all persons, including Defendants, to respect Window Gang's Mark as required under section 80-11.

92.     Thus, rather than advance an infringement claim to enforce rights and duties created and existing under contract, Window Gang rests its claim on a

statutory duty that exists independent of any contract duty Defendants may have under the 2007 Franchise Agreement. *See Rountree*, 796 S.E.2d at 831 (requiring tort action to "be grounded on a violation of a duty imposed by operation of law, and the right invaded [to] be one that the law provides without regard to the contractual relationship of the parties"); *see also Legacy Data*, 889 F.3d at 167 (applying economic loss rule to bar conversion claim where defendant "breached a duty it assumed only as a result of [the parties'] contract").

93.     Accordingly, Window Gang's infringement claim shall survive Defendants' Motion.

F.     Unfair or Deceptive Trade Practices

94.     Window Gang asserts a claim against all Defendants under the UDTPA. (*See* Am. Compl. ¶¶ 169–173.) To state a claim under the UDTPA, a plaintiff must allege: "(1) [that the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," *Johnson v. Phoenix Mut. Life Ins. Co.*, 300 N.C. 247, 263, 266 S.E.2d 610, 621 (1980), *overruled on other grounds, Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 374 S.E.2d 385 (1988), and is deceptive when it has the capacity or tendency to deceive, *RD&J Props. v. Lauralea-Dilton Enters., LLC*, 165 N.C. App. 737, 748, 600 S.E.2d 492, 501 (2004). Whether an act is unfair

or deceptive is a question of law for the court. *See Winston Realty Co. v. G.H.G., Inc.*, 314 N.C. 90, 96, 331 S.E.2d 677, 681 (1985).

95.     Defendants seek dismissal on the ground that Window Gang's UDTPA claim alleges nothing more than breach of contract and, in particular, fails to allege the "egregious or aggravating circumstances" our courts have required for a contract breach to constitute an unfair or deceptive trade practice under the UDTPA. *See, e.g., Harty v. Underhill*, 211 N.C. App. 546, 552, 710 S.E.2d 327, 332 (2011) ("[A] mere breach of contract does not constitute an unfair or deceptive act. Egregious or aggravating circumstances must be alleged before the provisions of the [UDTPA] may take effect."); *Eastover Ridge, LLC v. Metric Constructors, Inc.*, 139 N.C. App. 360, 367–68, 533 S.E.2d 827, 832–33 (2000) ("[I]t is well recognized . . . that actions for unfair or deceptive trade practices are distinct from actions for breach of contract, and that mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [N.C. Gen. Stat.] § 75-1.1."). Defendants, however, have construed Window Gang's allegations too narrowly.

96.     First, Window Gang pleads that Defendants violated the 2007 Franchise Agreement in various ways, including through the destruction of documents Defendants were obligated to return, (Am. Compl. ¶¶ 90–95), and by concealing their breach by making false statements to Window Gang, (Am. Compl. ¶¶ 89, 110–11).

97.     Contrary to Defendants' contention, this is the sort of egregious and aggravating conduct attendant to a contract breach that courts have found will sustain a claim under section 75-1.1. *See, e.g., N.C. Mut. Life Ins. Co. v. McKinley*

*Fin. Servs., Inc.*, No. 1:03CV00911, 2005 U.S. Dist. LEXIS 36308, at \*39 (M.D.N.C. Dec. 22, 2005) (finding "intentional destruction of relevant documents" could constitute "intentional action to mislead or deceive" under the UDTPA); *Garlock v. Henson*, 112 N.C. App. 243, 246, 435 S.E.2d 114, 115 (1993) (holding defendant's forgery to deceive plaintiff was "sufficiently aggravating" to sustain 75-1.1 violation); *Lendingtree, LLC v. Intercont'l Capital Grp., Inc.*, 2017 NCBC LEXIS 54, at \*8 (N.C. Super. Ct. June 23, 2017) (noting that "substantial aggravating circumstances attending the breach . . . generally involve forged documents, lies, and fraudulent inducements"); *Sparrow Sys., Inc. v. Private Diagnostic Clinic, PLLC*, 2014 NCBC LEXIS 70, at \*44–45 (N.C. Super. Ct. Dec. 24, 2014) (stating that "deceitful conduct in order to effectuate and conceal [a defendant's] breaches" combined with acts to "deter further investigation" may constitute aggravating circumstances under the UDTPA).

98. Second, in addition to alleging that Defendants breached the 2007 Franchise Agreement, Window Gang further contends that Defendants made misleading statements and representations concerning Window Ninjas' status as the same as, a successor to, or a continuation of Window Gang, which deceived Window Gang's customers while benefiting Defendants at Window Gang's expense. (Am. Compl. ¶¶ 52–57, 59–61, 63, 72, 73; Am, Compl. Exs. 4–9, 11, 12.) Window Gang alleges that, in so doing, Defendants fraudulently induced at least one customer to retain Window Ninjas rather than Window Gang. (Am. Compl. ¶ 61.)

99. Such conduct may constitute unfair or deceptive acts under the UDTPA. *See Sunbelt Rentals*, 174 N.C. App. at 59, 620 S.E.2d at 230 (finding UDTPA violation where "defendants told customers [plaintiff's] name had changed to" that of the corporate defendant, "used [plaintiff's] lease contracts and pricing information, inserting their company name on the documents," and deleted plaintiff's job information); *Comp. Design & Integration, LLC v. Brown*, 2017 NCBC LEXIS 8, at *34 (N.C. Super. Ct. Jan. 27, 2017) (finding likelihood of success on UDTPA claim based on defendants' "false statements concerning [corporate defendant's] status as a successor to, or a continuation of, [the corporate plaintiff] in an effort to advantage [d]efendants in their trade and business at [p]laintiff's expense with intended and resulting harm to [p]laintiffs").

100. In addition, Window Gang's allegations in support of its surviving claims for trademark infringement and misappropriation of trade secrets likewise support the denial of Defendants' Motion to dismiss Window Gang's UDTPA claim. *See* N.C. Gen. Stat. § 80-12 ("A violation of [N.C. Gen. Stat. §] 80-10 or [N.C. Gen. Stat. §] 80-11 constitutes a violation of [N.C. Gen. Stat. §] 75-1.1."); *Drouillard v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169, 172–73, 423 S.E.2d 324, 326–27 (1992); *S. Fastening Sys.*, 2015 NCBC LEXIS 42, at *28–29 (recognizing that trade secret misappropriation claim may form the basis for a UDTPA claim). Therefore, Window Gang's UDTPA claim shall not be dismissed on Defendants' Motion.

G.    Civil Obstruction of Justice and Civil Conspiracy

101.    Window Gang asserts claims against Defendants for civil obstruction of justice and civil conspiracy to commit obstruction based on Window Gang's allegations that Defendants caused Window Gang injury by engaging in a "mass deletion and destruction of files in the [Google] Account during the course of this litigation," (Am. Compl. ¶¶ 91–104, 162), and by "making . . . false statements to Window Gang and the Court regarding Defendants' use of the [Google] Account," (Am. Compl. ¶¶ 105–11, 162).    Window Gang alleges that Defendants' conduct has "prevent[ed], obstruct[ed], impede[d], and hinder[ed] public justice because the destroyed files were discoverable evidence" in this action, (Am. Compl. ¶ 165), the absence of which has "precluded Window Gang from being able to fully investigate and prosecute its claims against Defendants," (Am. Compl. ¶ 166), and "obtain the full legal remedies afforded by the Court's [injunctive relief]," (Am. Compl. ¶ 167).

102.    Defendants seek dismissal on the ground that common law claims for civil obstruction of justice and civil conspiracy based on that obstruction cannot be maintained for conduct occurring within the litigation in which the claim is brought. (Defs.' Supp. Br. 6.)  Rather, Defendants contend that in-suit conduct is appropriately policed through sanctions relief and limiting instructions rather than through separate causes of action for civil obstruction and civil conspiracy.  (Defs.' Supp. Br. 6.)  The Court agrees.

103.    The Supreme Court of North Carolina first recognized a civil claim for obstruction of justice in *Henry v. Deen*, 310 N.C. 75, 310 S.E. 326 (1984).  In that case,

the Supreme Court recognized obstruction of justice as an underlying wrongful act to support a civil conspiracy claim where defendant doctors were alleged to have falsified, destroyed, and concealed a decedent's medical records in an effort to hide their negligent conduct from the plaintiff. *Id.* at 87, 310 S.E.2d at at 334 ("Such acts by the defendants, if found to have occurred, would be acts which obstruct, impede, or hinder public or legal justice and would amount to the common law offense of obstructing public justice."); *cf. State v. Wright*, 206 N.C. App. 239, 241, 696 S.E.2d 832, 834–35 (2010) ("At common law it is an offense to do any act which prevents, obstructs, impedes or hinders public or legal justice.").

104. Our appellate courts have subsequently followed *Henry* and observed that "acts which obstruct, impede, or hinder public or legal justice . . . amount to the common law offense of obstructing justice, so that a complaint alleging that the defendants engaged in such activities states a claim for relief." *Blackburn v. Carbone*, 208 N.C. App. 519, 526, 703 S.E.2d 788, 794 (2010) (internal quotation marks omitted). "To create civil liability for conspiracy there must have been a wrongful act resulting in injury to another committed by one or more of the conspirators pursuant to the common scheme and in furtherance of the objective." *Henry*, 310 N.C. at 86–87, 310 S.E.2d at 334 (noting that a charge of conspiracy itself "does no more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under the proper circumstances the acts of one may be admissible against all").

105. The North Carolina appellate courts do not appear to have considered the precise issue raised by Defendants' Motion—i.e., whether a claim for obstruction of justice may be asserted for conduct occurring in the lawsuit in which the obstruction claim is brought. Indeed, the Court's research has not discovered any North Carolina decision in which a civil obstruction claim has been successfully maintained in such circumstances.

106. To the contrary, on the relatively infrequent occasions a common law obstruction claim has been advanced, the claim has been asserted against a party for pre-suit conduct or against a non-party, such as an expert witness or a juror, for conduct occurring in connection with a separate legal action. *See Grant v. High Point Reg'l Health Sys.*, 184 N.C. App. 250, 255–56, 645 S.E.2d 851, 855 (2007) (recognizing civil obstruction claim where defendant hospital destroyed decedent's medical records, precluding Rule 9(j) certification and thus medical malpractice action); *Jones v. City of Durham*, 183 N.C. App. 57, 59, 643 S.E.2d 631, 633 (2007) (recognizing civil obstruction claim where defendant destroyed evidence prior to commencement of litigation); *Burgess v. Busby*, 142 N.C. App. 393, 409, 544 S.E.2d 4, 13 (2001) (recognizing civil obstruction claim where jurors in medical malpractice action sued doctor in separate lawsuit for conduct occurring in connection with the prior malpractice action).

107. The Court is not prepared to recognize a civil obstruction claim beyond the contexts in which our appellate courts have found such a claim to exist and thus will not extend the claim to circumstances, such as those here, where the alleged conduct

giving rise to the claim occurred in the very lawsuit in which the obstruction claim is asserted. The conduct Window Gang alleges in support of its claims, if proven, constitutes litigation misconduct that is fully redressible by the Court's sanction and contempt powers, including through jury instructions at trial.[11] Given that, in *Henry*, the Supreme Court found it significant in recognizing a civil obstruction claim that "at the time of the alleged conspiracy no court had jurisdiction [over] the defendants," *Henry*, 310 N.C. at 89–90, 310 S.E.2d at 335–36, this Court, which has jurisdiction over Defendants, is not prepared to afford relief through a civil obstruction cause of action. In light of the Court's conclusion as to the predicate civil obstruction claim, Window Gang's civil conspiracy claim necessarily fails. Window Gang's civil obstruction and civil conspiracy claims shall therefore be dismissed.

IV.
CONCLUSION

108. **WHEREFORE**, for the foregoing reasons, the Court hereby **GRANTS in part** and **DENIES in part** Defendants' Motion to Dismiss as follows:

  a. The Court **GRANTS** Defendants' Motion as to Window Gang's claim against Salinas, Gang Group, and the Affiliated Defendants for breach of the Non-compete and dismisses that claim with prejudice.

  b. The Court **DENIES** Defendants' Motion as to Window Gang's claim for conversion against Window Ninjas. The Court **GRANTS** Defendants'

---

[11] North Carolina recognizes a criminal statutory claim, which defines obstruction of justice as willfully disobeying or violating "any injunction, restraining order, or any order lawfully issued by any court" but noting that the statute "shall not in any manner affect the court's power to punish for contempt." N.C. Gen. Stat. § 14-226.1.

Motion as to Window Gang's claim for conversion against Salinas, Gang Group, and the Affiliated Defendants and dismisses that claim with prejudice.

c. The Court **GRANTS** Defendants' Motion as to Window Gang's claim for tortious interference with contract against all Defendants and dismisses that claim with prejudice.

d. The Court **DENIES** Defendants' Motion as to Window Gang's claim for tortious interference with prospective economic advantage against all Defendants.

e. The Court **GRANTS** Defendants' Motion as to Window Gang's claim for misappropriation of trade secrets against all Defendants to the extent it is based on "[i]nformation regarding [Window Gang's] proprietary equipment and chemical cleaning solutions," and dismisses that claim with prejudice. The Court otherwise **DENIES** Defendants' Motion as to Window Gang's claim for misappropriation of trade secrets.

f. The Court **DENIES** Defendants' Motion as to Window Gang's claim for trademark infringement under N.C. Gen. Stat. § 80-11 against Salinas, Gang Group, and Window Ninjas.

g. The Court **DENIES** Defendants' Motion as to Window Gang's claim for unfair or deceptive trade practices under N.C. Gen. Stat. § 75-1.1 against all Defendants.

h. The Court **GRANTS** Defendants' Motion as to Window Gang's claims for civil obstruction and civil conspiracy against all Defendants and dismisses those claims with prejudice.

**IT IS SO ORDERED**, this the 2nd day of April, 2019.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge
